Robert TAYLOR, Plaintiff,

v.

James T. PLOUSIS, Sheriff of Cape May County Jail, William H. Fauver, Commissioner of the Department of Corrections of the State of New Jersey, John Doe, Medical Director at the Cape May County Jail, Correctional Medical Services, John and Jane Doe, Chairman of the Board of Freeholders, John Doe, Inmate at Cape May County Jail, Dr. Jane and John Doe, Doctors at Cape May County Jail, John Doe, Warden and Administrator at Cape May County Jail, Defendants.

Civil Action No. 98–3035.

United States District Court, D. New Jersey.

June 20, 2000.

Gary Mitchell Gash, White Plains, NY, for Plaintiff.

Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C. by Susanna J. Morris, Cherry Hill, NJ, for Defendants County of Cape May, James T. Plousis, Jean Crean, Lt. Thomas Shagren, and Lt. Edward J. Letts.

Murphy & O'Connor by Stephan E. Siegrist, Haddonfield, NJ, for Defendants Correctional Health Services, Inc., Dr. Angelique Beckett, Mary Franks, and Dr. Larry Pettis.

## OPINION

IRENAS, District Judge.

Plaintiff Robert Taylor ("Plaintiff" or "Taylor") is currently incarcerated in South Woods State Prison in Bridgeton, New Jersey. On June 29, 1998, Taylor filed a civil rights action pursuant to 42 U.S.C. § 1983 against several defendants, including the County of Cape May ("Cape May"), James T. Plousis ("Plousis"),and Correctional Health Services, Inc. ("CHS").

Two separate motions for summary judgment have been filed in this case. Defendants CHS, Dr. Larry Pettis, Dr. Angelique Beckett, and Mary Franks (hereafter "CHS defendants") move for summary judgment on the ground that the established facts fail to support plaintiff's claims. Defendants County of Cape May, James T. Plousis, Jean Crean, Edward Letts, and Thomas Shagren (hereafter "County defendants") have filed a similar motion and also assert the defense of qualified immunity. For the reasons set forth below, each motion is granted in part and denied in part.[1]

---

**1.** According to plaintiff, defendant Charlotte Hill is deceased. (Pl.'s Opp, 12, n. 9.) Before an action can be brought against a personal representative of a decedent, a plaintiff must

## I.

Plaintiff's allegations arise from the treatment he received between June of 1997 and February of 1998 at the Cape May County Jail, where the plaintiff was held awaiting trial. Plaintiff complains that he was denied adequate medical treatment to address his condition as a dual amputee. He claims that defendants failed to provide him with new stump socks, denied him his needed pain killer (Motrin) on several occasions, and forced him to walk on a broken prosthesis for seven months. Plaintiff claims that the broken prosthesis was held on by tape and that the strap mechanism that held the prosthesis to the leg was three inches too small.

Upon his entry into the Cape May County Jail, defendant Angelique Colbert–Beckett, D.O., performed an initial physical exam of plaintiff. At this time, plaintiff was wearing a prosthesis which attached to his left leg above the knee. According to plaintiff, the prosthesis was in an obvious state of disrepair. Plaintiff testified that the foot portion of the prosthesis was broken and was secured with postal tape and that the foot would bend inward while he walked. (Pl.'s Ex. B, Dep. of R. Taylor, 11–12.) Dr. Beckett did not inquire about or examine plaintiff's prosthesis during the exam. (Pl.'s Ex. G, Dep. of A. Beckett, 91.) However, she gave plaintiff a prescription for 800 mg of Motrin for thirty days in case plaintiff experienced "phantom limb pain" related to his amputation. (*Id.* at 37.)

On July 3, 1997, plaintiff submitted a medical request form "to find out how to go about receiving [sic] a new prosthe-

sis...." (Pl.'s Ex. D, Medical Request Slip.) Plaintiff was told that the medical department would not have a problem with him receiving a new prosthesis from a source outside of the prison. Plaintiff was referred to Jean Crean, a prison social worker, for any further requests.

On July 6, 1997, plaintiff submitted a second medical request slip asking to see a doctor "about some problems" he was having and again inquired about a new prosthesis. (Pl.'s Ex. E.) He did not receive a response to this request. On July 10, 1997, plaintiff filled out an inmate/staff correspondence form addressed to Jean Crean. Plaintiff asked Crean to contact Frank J. Malone & Son, Inc., ("Malone's") a medical device company where plaintiff had been fitted for a new prosthesis prior to his incarceration. Apparently, plaintiff was allowed to call himself. The reply to plaintiff's inmate/staff correspondence form states, "you called Limb Co.—limb not ready." (Pl.'s Ex. H.)

On July 26, 1997, plaintiff submitted an inmate/staff correspondence form to the Medical Department. (Pl.'s Ex. I.) Plaintiff stated that he was in pain and needed his pain medication renewed. (*Id.*) Dr. Beckett did not examine plaintiff at this time, but she did renew his prescription for pain medication.

On August 11, 1997, plaintiff was weighed by the medical staff and his weight was recorded as 155 ½ pounds, an increase of nearly 17 pounds since the date he entered the Cape May Jail. On August 19, 1997, plaintiff was weighed again, he

move the court to substitute the personal representative for the decedent. Rule 25 of the Federal Rules of Civil Procedure provides that a party must file such a motion with the court within ninety days of the filing of a "suggestion of death" for the deceased defendant; otherwise, the action shall be dismissed against the deceased defendant. In this case, neither party has, as yet, filed a "suggestion of death" as provided in Rule 25. Thus, while it appears that Ms. Hill is no longer a proper

party in this action, the Court is, at this time, without authority to order the substitution of proper parties. *See Stevens v. American Risk Mgmt. Inc.*, Nos. 89CIV2999JSM(AJP), 91CIV2898JSM(AJP), 1995 WL 479438, at *2 (S.D.N.Y. August 14, 1995)("This requirement of a formal suggestion of death is absolutely necessary to trigger the running of the ninety days. Actual knowledge of the party's death is not sufficient, nor is mention of the death in court proceedings or pleadings.")

weighed 158 pounds.[2] On September 27, 1997, plaintiff complained of "aches and pains" and was given a prescription for Tylenol.

On November 9, 1997, plaintiff submitted an inmate/staff correspondence form to the medical staff. Plaintiff stated, "[m]y prosthesis no longer fits me, the socket is to[o] small for the stump, and the leather belt is way to[o] tight and is leaving welts around my hip. The foot is brok[en] and is causing me pain in my lower back, when I'm walking around the yard. I already put in a request last week." (Pl.'s Ex. L.) The reply area of the inmate/staff form indicates that plaintiff was put on the list to see a doctor. On November 12, 1997, Dr. Beckett examined plaintiff. She recorded in her notes that, "[p]atient's artificial leg is wearing out," and that, "Medical Dept. will arrange to have prosthesis fitted & delivered to the jail ASAP." (CHS' Ex. J.) Dr. Beckett testified that she wrote an order to the Medical Department requesting that they arrange delivery of the prosthesis previously ordered from Malone's. (Pl.'s Ex. G, Dep. of A. Beckett, 119.)

On November 23, 1997, plaintiff sent another inmate/staff correspondence form to the medical department. Plaintiff stated:

The new prosthesis that was being made for me is no longer the right size. I would like to inform you that the belt that holds the prosthesis on to my stump is way to small. It is starting to cut into my hip. I'm in severe pain from this. What are we going to do about this!! I been in alot of pain for over a month, my back i[s] hurt[ing] from the broken foot.

(Pl.'s Ex. N.) Plaintiff was scheduled for an appointment with Dr. Beckett on December 2, 1997.

Nurse Mary Franks testified that "[s]omewhere between November 12th and the end of the month" the medical staff became aware that the medical device ordered from Malone's "was not going to be coming" and that plaintiff "was requesting that we provide him with a prosthetic device." (Pl.'s Ex. M, Dep. of M. Franks, 107–108.) She testified that, in mid- to late-November, Dr. Beckett ordered the purchase of a new prosthesis. (*Id.* at 108–109.) However, Dr. Beckett testified that she never ordered anyone to obtain a prosthesis for plaintiff other than the prosthesis manufactured by Malone's. (Pl.'s Ex. G, Dep. of A. Beckett, 119–120.)

On November 24 and November 26, 1997, plaintiff again wrote to the Medical Department concerning his prosthesis. On December 2, 1997, plaintiff met with Dr. Beckett. In her progress notes, Dr. Beckett stated, "[p]atient still needs a new prosthesis. Medical staff is trying to find out what arrangements can be made to remedy this situation." (Pl.'s Ex. Q.) Three days later, on December 5, 1997, plaintiff sent another request to the Medical Department: "When is the Medical Dept. going to have my prosthesis fix[ed]? I'm in a lot of pain! HELP!!" (Pl.'s Ex. R.) A notation was made in the reply portion of this form stating, "[p]rosthesis is being looked into." (*Id.*)

Nurse Mary Franks testified that between November of 1997 and January of 1998, she requested permission from defendant Shagren to order a new prosthesis for plaintiff. In her answer to an interrogatory, Nurse Franks certified:

Mary Franks spoke to Lt. Thomas Shagren, who stated that plaintiff was scheduled to be sentenced on or about November 4, 1997. Once plaintiff was sentenced, he would go to State prison and receive his leg prosthesis if necessary. The same call was made to Lt. Shagren in December and he stated that

---

2. The CHS defendants concede that plaintiff's weight gain led to or exacerbated the problems with his prosthesis. *See* CHS' brief, 14 ("There were problems with plaintiff gaining weight, with the need for fittings, and with later approval for a different new leg due to plaintiff's weight gain.")

plaintiff was going out after the first of the year and that he could get his leg prosthesis at the State prison if necessary. The same call was made to Lt. Shagren in January and he stated that plaintiff would be sentenced soon and to hold off on ordering the leg prosthesis. (Pl.'s Ex. S.)

Contrary to the testimony of Nurse Franks, the County defendants deny that any Cape May County employee had knowledge of plaintiff's need for a new prosthesis prior to January of 1998:

At no time during October, November, or December of 1997 did any member of the Correction Division Administration—this includes the Sheriff, Col. Edward Letts and the above-named lieutenants [including Lt. Shagren]—receive a request from Charlotte Hill or Mary Franks regarding the need to order a leg prosthesis for Robert Taylor. During the latter part of January 1998 (after Rober Taylor was sentenced and scheduled to leave CMCC) (then) Lt. Shagren had a conversation with a Correctional Health Services(CHS) nurse regarding a new leg prosthesis for Robert Taylor. At this date, Warden Shagren is unable to recall the name of the nurse with whom he spoke.

(Pl.'s Ex. U, J. Plousis' Answers to Interrogatories, 2–3.) Similarly, defendant Shagren stated at his deposition that, "if the medical department had ordered it, we would have provided it." (Pl.'s Ex. F, dep. of Shagren/Letts, 23.)

Just prior to December 25, 1997, Lt. Shagren observed plaintiff's condition first-hand. Lt. Shagren testified that he visited the inmates' ceramic program to observe the inmates' work on their annual Christmas donation to a nursing home. Shagren stated that all inmates were working on the project except for plaintiff who was "in the corner using a ceramic tool trying to make an extra hole in the leather strap of the prosthesis." (Id. at 40.) Shagren told plaintiff, "I would prefer you not ruin one of my ceramic tools to do that" and arranged to have a maintenance person punch the hole. (Id. at 50.)

On January 13, 1998, Dr. Beckett examined plaintiff. In her notes corresponding to this examination, Dr. Beckett wrote that plaintiff would receive a new prosthesis after his transfer to a State facility. Dr. Beckett noted that plaintiff was "not having any problems and [was] doing well on meds." (Pl.'s Ex. V.)

On January 13, 1998, plaintiff sent an inmate/staff correspondence form to Undersheriff Letts, and indicated that his "medical needs" remained unfulfilled. (Pl.'s Ex. W.) According to defendants Plousis, Letts, Shagren, and Cape May County, this was the first notice any Cape May County employee received from plaintiff regarding his need for a new prosthesis. On or about January 14, 1998, defendant Shagren met with plaintiff to discuss his medical needs and his impending transfer. (Id.) Lt. Shagren advised plaintiff that he would be transferred on February 1, 1998. Lt. Shagren wrote on the inmate/staff correspondence form that plaintiff's "medical problem is a need for new fittings on his leg prosthesis." (Id.)

On or about January 21, 1998, Lt. Shagren met with one of the nurses employed by CHS who advised Shagren of plaintiff's need for a new prosthesis. Defendants Plousis, Letts, Shagren and Cape May County claim that this was the first communication between any County employee and CHS regarding plaintiff's need for a new prosthesis.

In anticipation of plaintiff's impending transfer, Dr. Beckett filled out a "Confidential Medical Record for Inmate Transfers." (Pl.'s Ex. CC.) In this record, Dr. Beckett stated: "[Inmate] has gained a lot of [weight] and is waiting to be fitted for a new prosthesis as the one he has no longer sits properly and he is having difficulty ambulating." (Id.)

On February 3, 1998, plaintiff was transferred into State custody. At the time of his transfer, plaintiff weighed 170 pounds,

he had gained more than thirty pounds since his admission into the Cape May County Jail. (Pl.'s Ex. Y.) After he was transferred, State officials placed plaintiff in a wheelchair. On February 10, 1998, plaintiff was examined by Dr. R. Occasio of the State Department of Corrections. Dr. Occasio gave plaintiff three new stump socks and noted that, "[p]rosthesis is in seriously irreparable condition and needs replacement." (Pl.'s Ex. Z.)

Both the County defendants and the CHS defendants have filed motions for summary judgment. The County defendants argue that any failure to order a new prosthesis for plaintiff was due to CHS defendants' failure to request one. They also argue that defendants Plousis, Letts, and Shagren are entitled to qualified immunity. The CHS defendants claim that they were not deliberately indifferent to any "serious medical need" alleged by plaintiff.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

■ In plaintiff's Amended Complaint, in his "First Claim for Relief," plaintiff asserts a claim under 42 U.S.C. § 1983. Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To assert a claim successfully under § .1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person "acting under color of State law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir.1990). In addition, the Third Circuit requires that § 1983 claims be pled with a modicum of factual specificity identifying the particular conduct of the defendants that is alleged to have harmed the plaintiff. *Darr v. Wolfe*, 767 F.2d 79, 80 (3d Cir.1985).

■ The Eighth Amendment provides a constitutional basis for a § 1983 claim by prisoners alleging inadequate medical care.[3] However, "[f]ailure to provide med-

---

**3.** As a pretrial detainee, Taylor was not protected by the Eighth Amendment. However it is firmly established that a pretrial detainee is entitled to the same rights as a convicted prisoner. *See Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners"). These rights stem from the Due Process Clause of the Fourteenth Amendment to the Constitution. *Id.* at 535, 99 S.Ct. 1861. Accordingly, courts have applied the same standard to claims of "deliberate indifference" asserted under the Due Process Clause as those under the Eighth Amendment. *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1067 (3d

ical care to a person in custody can rise to the level of a constitutional violation [of the Eighth Amendment] under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs." *Groman v. Township of Manalapan*, 47 F.3d 628, 636–37 (3d Cir.1995).

■ The "deliberate indifference" standard is, in effect, a twopronged test, requiring (1) that the prisoner's medical needs be serious, and (2) that there be deliberate indifference on the part of defendants. *See Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979); *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). A mere disagreement with the form of treatment does not rise to a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Moreover, medical malpractice, even if it did occur, does not become a constitutional claim merely because the victim is a prisoner. *Id.* at 106, 97 S.Ct. 285.

■ Construing the facts in the light most favorable to plaintiff, the non-moving party, plaintiff has established that his need for a new prosthesis constituted a "serious medical need." The Third Circuit has defined a "serious medical need" as "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Lanzaro*, 834 F.2d at 347. Also, a medical need will be considered "serious" where delay in treatment results in the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 103, 105, 97 S.Ct. 285. Moreover, several courts have recognized that a medical condition which threatens a plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a "serious medical need." *See,*

*e.g., Kaufman v. Carter*, 952 F.Supp. 520, 527 (W.D.Mich.1996)("A medical condition that threatens one's ability to walk, even if ultimately reversible, is unquestionably a serious matter."); *Johnson v. Hardin County*, 908 F.2d 1280, 1283–84 (6th Cir.1990)(holding that defendant's refusal to provide inmate with crutches supported claim of deliberate indifference).

Here, plaintiff has testified, and defendants have not disputed, that his ill-fitting and deteriorating prosthesis caused him to suffer severe pain and impaired his ability to walk. As noted above, on November 23, 1997, plaintiff filled out a medical correspondence form which stated:

> The new prosthesis that was being made for me is no longer the right size. I would like to inform you that the belt that holds the prosthesis on to my stump is way to[o] small. It is starting to cut into my hip. I'm in severe pain from this. What are we going to do about this!! I been in alot [sic] of pain for over a month, my back i[s] hurt[ing] from the broken foot.

(Pl.'s Ex. N.) Plaintiff testified that his prosthesis became so painful that he would only wear it when absolutely necessary:

> A: ... The only time I try to wear the leg is going to ceramics class. Then I unstrap the leg. And they made me put it on every day and every night to go to the cart and get medicine....
>
> ...
>
> Q: Why did you try to keep it off as much as you could?
> A: The Pain.

(Pl.'s Ex. B, dep. of R. Taylor, 39:24–25, 40:1, 21–23.) Accordingly, for purposes of this motion, plaintiff has established that he suffers from a "serious medical need." *See, e.g., Newman v. Alabama*, 503 F.2d 1320, 1331 (5th Cir.1974) (holding that the failure to provide inmate with eyeglasses and prosthetic devices, *inter alia*, can con-

Cir.1991)(holding that the deliberate indifference standard used in Eighth Amendment cases applies to pretrial detainees under the

Fourteenth Amendment); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)(same).

stitute deliberate indifference); *McCabe v. Prison Health Services,* No.Civ.A. 94–7286, 1997 WL 710943, at *11 (E.D.Pa. Nov. 14, 1997)(denying summary judgment motion of defendant doctor in light of plaintiff's allegations that doctor first denied him a prosthesis then provided him with an inadequate one); *Ford–Bey v. Sciubba,* Civ.A.No. 87–0086, 1987 WL 17565 (E.D.Pa. Sept. 24, 1987)(holding that inmate's allegations that prison officials ignored inmate's requests for repair of prosthetic leg stated a claim of deliberate indifference).

■■■ In order to satisfy the second-prong of the deliberate indifference standard, plaintiff must show that each defendant acted with deliberate indifference to his serious medical needs. *See Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988) (holding that to incur liability in a civil rights action, the defendant must have some type of personal involvement in the incidents that are alleged to have violated plaintiff's civil rights). The level of culpability required to establish deliberate indifference lies between the extremes of mere negligence and actual malice. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Essentially, plaintiff must establish that each defendant knew of and disregarded an excessive risk to inmate safety, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 537, 114 S.Ct. 1970.

### 1. County of Cape May and Correctional Health Systems, Inc.

■■ In *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality may not be held liable under § 1983 under a theory of respondeat superior. Neither the Supreme Court nor the Third Circuit has yet determined whether a private corporation performing a municipal function is subject to the holding in *Monell.* However, the majority of courts to have considered the issue have determined that such a corporation may not be held vicariously liable under § 1983. *See, e.g., Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir.1982)(holding that reasoning of Supreme Court in Monell was equally applicable to private corporations and that § 1983 "evinc[ed]" a Congressional intent not to impose vicarious liability); *Iskander v. Vill. of Forest Park,* 690 F.2d 126, 128 (7th Cir.1982)(same); *Miller v. City of Philadelphia,* No. Civ. A. 96–3578, 1996 WL 683827, at * 8 (E.D.Pa. Nov. 25, 1996)(same). The Court accepts the reasoning in these cases.[4] Thus, in order to

---

4. Almost every court to have considered the issue has held that a private corporation, like a municipality, may not be held vicariously liable under § 1983. *See, e.g., Iskander v. Village of Forest Park,* 690 F.2d 126, 128 (7th Cir.1982); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir.1982); *Scheetz v. Morning Call, Inc.,* 747 F.Supp. 1515, 1520 (E.D.Pa.1990); *Ibarra v. Las Vegas Metro. Police Dep't,* 572 F.Supp. 562, 563–64 (D.Nev. 1983). Although the majority of courts to have reached this conclusion have done so with relatively little analysis, treating the proposition as if it were self-evident, the Court accepts the holdings of these cases as the established view of the law. However, there remains a lingering doubt whether the public policy considerations underlying the Supreme Court's decision in *Monell* should apply when a governmental entity chooses to discharge a public obligation by contract with a private corporation.

In *Monell,* the Supreme Court held that municipalities could not be found vicariously liable under § 1983 based upon: (1) Congressional intent, specifically, Congress' rejection of an amendment to a separate section of the Civil Rights Act of 1871 which involved a form a vicarious liability; (2) "the absence of any language in § 1983 which can easily be construed to create respondeat superior liability," 436 U.S. at 692 n. 57, 98 S.Ct. 2018; and (3) the policy considerations underpinning the doctrine of respondeat superior. This Court does not suggest that either prong one or two of this analysis was erroneous. However, it is worth noting what the Supreme Court itself noted, "Section 1 [of the Civil Rights Act of 1871], now codified at 42 U.S.C. § 1983 was the subject of only limited

assert a claim against either the County of Cape May or CHS, plaintiff must show that a constitutional deprivation resulted from an official custom or policy or, alternatively, from the actions of an official with "final authority to establish municipal policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

debate and was passed without amendment." *Id.* at 665, 98 S.Ct. 2018.

As to the third prong of the Supreme Court's analysis, the Court believes that the policy considerations applicable to municipalities are different than those applicable to private corporations which contract to perform municipal functions. Governmental entities do not get to pick and choose the activities in which they will engage; these obligations are imposed by law. Thus, various immunities and privileges given to governmental entities by state and federal law reflect the notion that the taxpayers and public officials should not be exposed to the burdens of litigation when carrying out their mandated activities. An argument can be made that voluntarily contracting to perform a government service should not free a corporation from the ordinary respondeat superior liability.

A parallel argument involves claims of qualified immunity which often protect government officials charged with a constitutional violation. If a private corporation undertakes a public function, there is still state action, but individual employees of that corporation do not get qualified immunity. *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). In *Richardson*, the Supreme Court held that the purposes underlying the immunity doctrine did not warrant extension of immunity to private prison guards. First, the Court held that marketplace pressures provided private corporations with incentives to avoid overly timid job performance. The Court noted:

[G]overnment employees typically act within a different system. They work within a system that is responsible through elected officials to voters who, when they vote, rarely consider the performance of individual subdepartments or civil servants specifically and in detail. And that system is often characterized by multidepartment civil service rules that, while providing employee security, may limit the incentives or the ability of individual departments or supervisors flexibly to reward, or to punish, individual employees. Hence a *judicial determination* that 'effectiveness' concerns

In this case, plaintiff has adduced no evidence of a policy or custom, enacted by either the County of Cape May or CHS, which amounted to deliberate indifference to plaintiff's medical needs. Nor has plaintiff introduced evidence that any official with final policymaking authority acted with deliberate indifference to his need for adequate medical care.[5] Accordingly, de-

warrant special immunity-type protection in respect to this latter (governmental) system does not prove its need in respect to the former [private]. Consequently, we can find no special immunity-related need to encourage vigorous performance.

*Id.* at 410, 117 S.Ct. 2100.

Second, the Court explained that the availability of comprehensive insurance coverage to private prison guards minimized the likelihood that employees would be discouraged from accepting such positions. *Id.* Finally, the Court held that the "threat of distraction" from private lawsuits was not sufficient to justify extending the immunity doctrine to private employees engaged in public functions. *Id.* at 411–12, 117 S.Ct. 2100.

The policy considerations which prompted the Supreme Court to reject qualified immunity for private prison guards are the same considerations which suggest that private corporations providing public services, such as prison medical care, should not be immune from respondeat superior liability under § 1983. In the context of a claim that the deprivation of medical care amounted to a constitutional violation, proof of such claim would almost certainly prove a case of ordinary state law malpractice where respondeat superior would apply. It seems odd that the more serious conduct necessary to prove a constitutional violation would not impose corporate liability when a lesser misconduct under state law would impose corporate liability.

5. In a footnote on page 28 of his Opposition brief, plaintiff claims that the County of Cape May may be held liable under *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Plaintiff alleges that defendants Letts and Shagren are policymakers "invested with the power of the purse on medical decisions." (Pl.'s Opp., 28.) However, the record indicates that defendants Letts and Shagren are not invested with final policymaking authority sufficient to impose liability on the County under *Pembaur*. In *Pembaur*, the county was held liable for the official decisions of the county sheriff because the

fendants' motion for summary judgment on the § 1983 claim is granted with respect to the County of Cape May and CHS.

### 2. James T. Plousis

■ At the time of the events relevant to this suit, James T. Plousis was employed as the Sheriff of the Cape May County Jail. Plaintiff has failed to proffer any evidence indicating that defendant Plousis knew of and disregarded plaintiff's medical needs. Without such evidence, defendant Plousis cannot be held liable solely on the basis of his official position. *See Wilson v. Horn*, 971 F.Supp. 943, 947 n. 2 (E.D.Pa.1997)(holding that the "mere fact that a [prison official] may hold a supervisory position is insufficient to find liability" under § 1983). Thus, the Court will grant defendants' motion for summary judgment on the § 1983 claim as to defendant Plousis.

### 3. Dr. Larry Pettis

Plaintiff has introduced scant evidence regarding the conduct of Dr. Pettis. On August 19, 1997, Dr. Pettis treated plaintiff for trigeminal neuralgia, an inflammation of a nerve which runs along the face. Dr. Pettis examined plaintiff and prescribed Elavil and Motrin. Plaintiff has introduced no evidence that this treatment was defective or unlawful in any way. Moreover, as noted above, plaintiff cannot assert a claim against Dr. Pettis on the basis of respondeat superior. Thus, defendants' motion for summary judgment on the § 1983 claim is granted with respect to Dr. Pettis.

### 4. Jean Crean

On July 3, 1997, plaintiff submitted a medical request form "to find out how to

go about reciving [sic] a new prosthesis...." (Pl.'s Ex. D.) Plaintiff was referred to Jean Crean, the prison social worker, who arranged for plaintiff to telephone Malone's regarding his prosthesis. (Pl.'s Ex. B, dep. of R. Taylor, 18.) According to plaintiff, an employee at Malone's told him that his leg was not ready and that he would need to travel to Philadelphia for another fitting. (*Id.* at 18:2–15.) Later, plaintiff filled out an inmate/staff correspondence form addressed to Crean. Plaintiff states that Crean made a second phone call to Malone's, "I'm pretty sure Jean [Crean] must have asked about them coming down but that's not on the slip." (*Id.* at 19: 4–5.) Based on the record currently before the Court a reasonable jury could not conclude that Crean was deliberately indifferent to plaintiff's need for a new prosthesis. To the contrary, the record indicates that Crean responded to plaintiff's requests promptly and assisted him in his quest to obtain a new prosthesis. The Court will grant defendants' motion for summary judgment on the § 1983 claim as to defendant Jean Crean.

### 5. Dr. Angelique Beckett

■ It is clear that Dr. Beckett was aware of plaintiff's need for a new prosthesis at latest, in November of 1997. Dr. Beckett was deposed on February 1, 2000, and the following testimony was elicited:

Q: What happened on 11/12/97?

A: I saw the inmate [Taylor] and he essentially, you know, was talking to me about the fact that his artificial leg was wearing out, and he showed it to me and I agreed with him, I agreed that it was

---

sheriff was "responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483–484, 106 S.Ct. 1292. Defendant Shagren testified, and plaintiff has not disputed, that the final authority to pay for and procure a medical device such as a prosthetic leg rested with Sheriff Plousis. (Pl.'s Ex. F, dep. of T. Shagren,

33:3–21.) As noted in Part III, subsection 2, of this Opinion, there are no facts in the record which suggest that defendant Plousis made any decision which amounted to deliberate indifference to plaintiff's medical needs. Accordingly, the County of Cape May cannot be held liable under the reasoning of *Pembaur*.

wearing out, the prosthesis was wearing out. It looked like he needed a new one. (Pl.'s Ex. G, dep. of A. Beckett, 119:1–7.) Thus, the sole remaining question is whether Dr. Beckett acted with deliberate indifference to plaintiff's need for a new prosthesis.

Following Dr. Beckett's examination of plaintiff on November 12, 1997, Dr. Beckett wrote in her medical notes, "Medical Dept. will arrange to have prosthesis fitted & delivered to the jail ASAP." (CHS' Ex. W.) Nurse Franks testified that in mid- to late-November, Dr. Beckett ordered the purchase of a new leg for plaintiff. However, Dr. Beckett examined plaintiff again on December 2, 1997, and recorded in her notes, "[p]atient still needs a new prosthesis. Medical staff is trying to find out what arrangements can be made to remedy this situation." (Pl.'s Ex. Q.) On January 13, 1998, Dr. Beckett wrote, "[p]atient will be getting new prosthesis after going to State facility." (Pl.'s Ex. V.) Finally, on February 2, 1998, on a form captioned "Confidential Medical Record for Inmate Transfers," Dr. Beckett wrote, "[inmate] has gained a lot of [weight] and is waiting to be fitted for a new prosthesis as the one he has no longer sits properly and he is having difficulty ambulating." (Pl.'s Ex. CC.)

The CHS defendants argue that Dr. Beckett was not deliberately indifferent because she "ordered that Mr. Taylor be provided with the leg prosthesis that was being made for him in Philadelphia when she saw Mr. Taylor in November and December, 1997." (CHS' brief, 12.) Dr. Beckett testified that, on November 12, 1997, she told plaintiff, "... let's see if we can arrange to, you know, get it, if it's already done, waiting for you, you know, ready to go." (Pl.'s Ex. G, 119:16–18.) In contrast, plaintiff claims that Dr. Beckett told him that a representative from Malone's would not travel to the Cape May County Jail without compensation and CHS would not pay for such an expenditure. (Pl.'s Ex. B, 15.) In light of plain-tiff's testimony, a genuine issue of material facts remains as to whether Dr. Beckett actually sought to obtain a prosthesis for plaintiff and, if so, what efforts she made on his behalf. Accordingly, the Court will deny defendants' motion for summary judgment on the § 1983 claim as to Dr. Beckett.

### 6. Edward J. Letts

During the relevant time period, defendant Letts worked as the undersheriff to defendant Plousis. Defendant Letts testified that the first time he was made aware of any problems concerning plaintiff's prosthetic leg was on January 13, 1998, when he received an inmate/staff correspondence form from plaintiff. (Pl.'s Ex. F, dep. of E. Letts, 106:20–23.) He further testified:

Q: Had anyone spoken with you about that concern or had you reviewed any inmate medical or other correspondence of any kind before that point in time?

A: No, sir, not to my recollection.

(Id. at 106:24–25, 101:1–2.)

Upon receiving plaintiff's correspondence of January 13, 1997, defendant Letts referred the matter to defendant Shagren. (Pl.'s Ex. F, dep. of T. Shagren, 54:16–24.) Plaintiff was transferred to state prison on February 3, 1998.

■■■■ According to plaintiff and the CHS defendants, defendant Letts was notified of plaintiff's need for a new prosthesis on two occasions prior to January 13, 1997. First, the CHS defendants refer to the deposition testimony of defendant Franks. Defendant Franks testified that Nursing Administrator Charlotte Hill told her that defendant Letts was present at a meeting at which plaintiff's need for a new prosthesis was discussed. (Id. at 144:7–24, 343:17.) However, Nurse Hill's statement is inadmissible hearsay and may not be considered in the present motion. See Blackburn v. United Parcel Serv., 179 F.3d 81, 95 (3d Cir.1999)(citing Philbin v. Trans Union Corp., 101 F.3d 957, 961 n. 1

(3d Cir.1996))(noting that a hearsay statement that is not capable of being admitted at trial should not be considered at summary judgment stage).

Nurse Hill's alleged statement, that plaintiff's need for a prosthesis was discussed at a monthly meeting, is hearsay because it is an out-of-court statement offered for the truth of the matter asserted. Fed.R.Evid. 801(c). It is inadmissible because it does not fit into any of the exceptions to the hearsay rule recognized under Rules 803 or 804. *See* Fed.R.Evid. 802 (providing that hearsay is not admissible unless it falls under a particular exception). Accordingly, Nurse Frank's testimony regarding Charlotte Hill's statement will not be considered for purposes of this motion.

In opposition to defendant Letts' motion for summary judgment, plaintiff cites to a second portion of defendant Franks' testimony. Plaintiff claims, "Nurse Franks personally heard CHS Nursing Administrator Charlotte Hill advise defendant Letts of defendant Shagren of Cape May that, 'our physicians ordered a new leg, that a new leg be given to him.'" (Pl.'s opp., 12, n. 10)(citing dep. of M. Franks, 105, 108.) However, plaintiff mischaracterizes defendant Franks' testimony. Franks testified as follows:

> Q: You heard her [Charlotte Hill] in a phone conversation?
> A: Yes.
> Q: With who?
> A: I'm unsure.
> Q: What did you hear—
> A: I didn't listen to the other end.

(Pl.'s Ex. M, dep. of M. Franks 105:2–7.)

Franks' testimony, that she heard Charlotte Hill advise an unidentified person of plaintiff's medical needs, is insufficient to prove that defendant Letts had knowledge of such needs. Because plaintiff has offered no competent evidence that defendant Letts was aware of plaintiff's medical needs, he cannot show that defendant Letts was deliberately indifferent to those needs. Accordingly, defendants' motion for summary judgment is granted on plaintiff's § 1983 claim against Edward Letts.

### 7. Thomas Shagren and Mary Franks

Substantial issues of material fact remain as to whether defendants Shagren and Franks were deliberately indifferent to plaintiff's need for a new prosthesis. In their answer to the County defendants' interrogatories, the CHS defendants certified that:

> Mary Franks spoke to Lt. Thomas Shagren, who stated that plaintiff was scheduled to be sentenced on or about November 4, 1997. Once plaintiff was sentenced, he would go to State prison and receive his leg prosthesis, if necessary. The same call was made to Lt. Shagren in December and he stated that plaintiff was going out after the first of the year and that he could get his leg prosthesis at the State prison if necessary the same call was made to Lt. Shagren in January and he stated that plaintiff would be sentenced soon and to hold off on ordering the leg prosthesis.

(Pl.'s Ex. S, Ans. to Interrogs.) In addition, Nurse Franks testified:

> Q: And what did Lieutenant Shagren say to you and what did you say to him?
> A: I asked him if there was a sentencing date, and he said that there was, and it was the beginning of January.
>
> . . . .
>
> Q: What did he say about the subject?
> A: That [plaintiff] would be sentenced in the beginning of January, and that we were to hold, I believe, not to order the leg until after he was sentenced.

(Pl.'s Ex. M, 139:7–11, 140:4–7.)

In contrast, the Cape May defendants certified that:

> At no time during October, November, or December of 1997 did any member of the Correction Division Administration—this includes Sheriff, Col. Edward Letts, and the above-named lieutenants

[including Thomas Shagren]—receive a request from Charlotte Hill or Mary Franks regarding the need to order a prosthesis for Robert Taylor.

(Pl.'s Ex. U., J. Plousis' Ans. to Interrogs.) Also, defendant Shagren denied having any of the conversations with Nurse Franks alleged by the CHS defendants. At his deposition, defendant Shagren was read the CHS defendants' answers to interrogatories and asked about their accuracy:

Q: . . . . Just look at that to make sure. To the best of your recollection, was the response given by Mary Frank[s] to that question accurate or inaccurate in terms of your recall of the events?

A: Inaccurate.

Q: Tell me why.

A: I don't remember having any conversation outside of just prior to Mr. Taylor being shipped in January.

Q: Do you recall having any conversation with Mary Franks prior to January of 1998 with regard to the time when Mr. Taylor was going to be sentenced?

A: No, I do not.

Q: Do you recall having any conversation with Mary Franks as to whether the procurement of the prosthetic device should be delayed because he was going to some other facility?

A: No.

Q: Are there any other aspects of that response to that interrogatory that is inaccurate based upon your recollection of the events?

. . . .

A: That's inaccurate where it says I instructed her to hold off on ordering the leg prosthesis. I don't have that—even now I don't have that power.

(Pl.'s Ex. F, dep. of T. Shagren, 84:19–85:14, 86:3–5.)

Defendant Shagren further testified that it was a CHS employee who made the determination not to order plaintiff's prosthesis:

Q: Did you make any inquiries of any of the nurses as to whether any requests were made to anyone within CHS to obtain that device on behalf of Mr. Taylor?

A: No.

Q: Why not?

A: It's not my job to look into an inmate's medical needs.

Q: Mr. Letts asked you to follow-up on it, correct?

A: Yes, he did. He asked me to get him answers and I did that.

. . . .

A: I had a conversation a week probably after this slip. I informed the nurses when Mr. Taylor was being shipped out. The concern they had they indicated to me was the fact that he needed a new prosthesis, and I took it at that point as they were trying to figure out if there was enough time. And I indicated that we were shipping him within two weeks or a week at that point.

Q: And, therefore, there wasn't enough time?

A: Evidently, they made that determination.

(*Id.* at 81:3–13, 82:8–17.)

If either defendant, as alleged, deliberately delayed delivery of plaintiff's new prosthesis until his transfer to the state facility, a claim of deliberate indifference would exist. *See, e.g., Lanzaro,* 834 F.2d at 346 (holding that deliberate indifference exists where officials delay necessary medical treatment for non-medical reasons or where prison officials erect arbitrary and burdensome procedures that result in a significant delay in such treatment). The testimony of defendants Shagren and Franks is directly contradictory. Such a conflict can only be resolved by a determination of credibility, a function that is vested exclusively with the jury.

 Defendant Shagren further argues that he is entitled to the defense of qualified immunity. Qualified immunity

protects official action "if the officer's behavior was 'objectively reasonable' in light of the constitutional rights affected." *Giuffre v. Bissell,* 31 F.3d 1241, 1251 (3d Cir.1994). Construing the record in a light most favorable to plaintiff, Shagren's conduct violated a clearly established right to treatment for serious medical needs of which a reasonable prison official would have been aware. In fact, Shagren himself testified that the action or inaction with which he is charged would, if true, be wrongful:

Q: .... If it was determined that a particular type of treatment or a particular need of the inmate medically needed to be addressed at a particular point in time, could that or should that treatment nevertheless be delayed until the inmate is transferred to some other facility?

A: No.

Q: Why?

A: Because if the medical department ordered it, we would have provided it.

(Pl.'s Ex. F, dep. of T. Shagren, 23:7–16.) He further testified that, "If the doctor determined the inmate needed it and we were to say no, that's not right." *(Id.* at 35:3–5.) Thus the motions for summary judgment on behalf of defendant Shagren and defendant Franks are denied as to plaintiff's claims under § 1983.

### IV.

 In paragraph 51 of his Amended Complaint, plaintiff alleges that:

[O]n October 7, 1997, as a result of defendants' failure to protect plaintiff from known harm, a harm that was exacerbated by defendants' failure to attend to plaintiff's known medical needs, plaintiff was severely beaten by another inmate plaintiff. Defendant Beckett sent plaintiff to the hospital for possible sutures.

Courts have recognized so-called "failure-to-protect" claims under the Eighth Amendment, and have applied such claims to pretrial detainees under the Fourteenth Amendment. *Faulcon v. City of Philadelphia,* 18 F.Supp.2d 537, 540 (E.D.Pa.1998). For an inmate to prevail on a failure-to-protect claim, he must show that defendants acted with deliberate indifference to his health or safety. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. Specifically, the inmate must show that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

There is nothing in the record to suggest that any defendant knew plaintiff would be at risk by placing him in contact with other inmates. Plaintiff's condition as a dual-amputee is not alone sufficient to put defendants on notice of a serious risk. Additionally, there is no evidence that plaintiff ever complained of or mentioned a fear of physical attack from other inmates prior to the October 7th incident. Even if plaintiff had introduced evidence from which an inference of such knowledge could be raised, plaintiff has failed to introduce evidence suggesting that any defendant consciously disregarded such an "excessive risk" to plaintiff's safety. Finally, plaintiff has failed to demonstrate that either CHS or the County of Cape May had a policy or custom which resulted in the assault. Thus, defendants' motion for summary judgment is granted as to plaintiff's claims based upon the October 7, 1997, assault.

### V.

In plaintiff's "Second Claim for Relief," in his Amended Complaint, plaintiff alleges that defendants, "failed to use due, reasonable or proper care in their efforts to attend, care for and treat plaintiff and deviated from accepted standards of medical care...." (Pl.'s Am. Compl., ¶ 89.)[6]

6. In his opposition to defendants' motions for summary judgment, plaintiff consents to the

The CHS defendants argue that plaintiff's second claim for relief must be dismissed because it is essentially a claim of medical malpractice and plaintiff has failed to comply with the New Jersey Affidavit of Merit Statute, N.J.S.A. 2A:53A–27. N.J.S.A. 2A:53A–27 provides that in an action which alleges negligence or malpractice on behalf of a licensed nurse or physician:

> [P]laintiff shall, within 60 days following the date of filing an answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices....

The statute further provides that, "[i]f the plaintiff fails to provide an affidavit or a statement in lieu thereof ... it shall be deemed a failure to state a cause of action." N.J.S.A. 2A:53A–29.

The Supreme Court of New Jersey has held that, absent "extraordinary circumstances," the Court should dismiss the cause of action for failure to comply with the affidavit of merit requirement with prejudice. *Cornblatt v. Barow,* 153 N.J. 218, 708 A.2d 401, 413 (1998). Here, plaintiff concedes that he failed to comply with the terms of the statute. However, plaintiff argues that this failure should be excused because the requisite "extraordinary circumstances" exist. Plaintiff notes that he began this action as a *pro se* plaintiff and argues that his ability to engage counsel was hindered by his physical condition and his incarceration. Plaintiff argues, "[s]urely, a pro se litigant unable to retain counsel due to the very circumstances of his incarceration, forced to depend on a 'jailhouse lawyer', must be deemed to be under extraordinary circum-

stances that should render his failure to adhere to the procedural requirements of the law to be 'without prejudice' and, therefore, not fatal." (Pl.'s Opp., 33.)

New Jersey courts have repeatedly held that attorney carelessness will not constitute "extraordinary circumstances." *Burns v. Belafsky,* 326 N.J.Super. 462, 741 A.2d 649, 653 (App.Div.1999). Moreover, "ignorance of the law or failure to seek legal advice will not excuse failure to meet the filing deadline." *Hyman Zamft and Manard v. Cornell,* 309 N.J.Super. 586, 707 A.2d 1068, 1071 (App.Div. 1998). In this case, even if the Court were to overlook plaintiff's failure to file an Affidavit of Merit within the sixty-day period following defendants' Answer to the original Complaint, plaintiff provides no explanation for failing to do so after he retained counsel.

Since August 6, 1999, plaintiff has been represented by counsel. On September 17, 1999, this Court denied a motion for summary judgment on behalf of defendants, which included a ground that plaintiff had failed to file an Affidavit of Merit. The Court determined that further discovery was necessary and, therefore, denied the motion without prejudice to its possible renewal at a later date. The Court granted plaintiff leave to file an Amended Complaint "properly identifying the defendants and clarifying his causes of action."

Plaintiff filed an Amended Complaint on October 7, 1999, and the CHS defendants filed an Answer on December 6, 1999. However, once again, plaintiff failed to file the necessary Affidavit of Merit within sixty days of defendants' Answer. In fact, plaintiff did not file an Affidavit of Merit until May 22, 2000, approximately nineteen months after defendants' Answer to the original Complaint was filed, and more than five months after defendants' Answer to the Amended Complaint was filed. Be-

---

dismissal of his state law claims as to the County defendants. (Pl.'s Opp., 38.) Thus, the Court will analyze plaintiff's claim in his

Second Claim for Relief only with respect to the CHS defendants.

cause plaintiff has failed to establish "extraordinary circumstances" justifying this delay, defendants' motion is granted and plaintiff's second claim for relief set forth in his Amended Complaint is dismissed with prejudice.

## VI.

For the reasons set forth above, the County defendants' motion for summary judgment is granted in part and denied in part. Similarly, the CHS defendants' motion for summary judgment is granted in part and denied in part. Also, the second claim for relief in plaintiff's Amended Complaint is dismissed with prejudice. Remaining in this case are plaintiff's claims under § 1983 against defendants Beckett, Shagren and Franks. The Court will issue an appropriate order.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter having appeared before the Court upon the summary judgment motion of defendants County of Cape May, James T. Plousis, Jean Crean, Edward Letts, and Thomas Shagren, and the summary judgment motion of defendants Correctional Health Services, Inc., Dr. Larry Pettis, Dr. Angelique Beckett, and Mary Franks, and the Court having considered the submissions of the parties, for the reasons set forth in an Opinion issued by the Court, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing,

**IT IS** on this *20 th* day of June, 2000,

**ORDERED THAT:**

1. Defendants', County of Cape May, Plousis, Crean, Letts, and Shagren, motion for summary judgment is **GRANTED** as to plaintiff's claims under § 1983 against defendant the County of Cape May;

2. Defendants', County of Cape May, Plousis, Crean, Letts, and Shagren, motion for summary judgment is **GRANTED** as to plaintiff's claims under § 1983 against defendant Crean;

3. Defendants', County of Cape May, Plousis, Crean, Letts, and Shagren, motion for summary judgment is **GRANTED** as to plaintiff's claims under § 1983 against defendant Letts;

4. Defendants', County of Cape May, Plousis, Crean, Letts, and Shagren, motion for summary judgment is **DENIED** as to plaintiff's claims under § 1983 against defendant Shagren;

5. Defendants', Correctional Health Services, Inc., Dr. Pettis, Dr. Beckett, and Mary Franks, motion for summary judgment is **GRANTED** as to plaintiff's claims under § 1983 against defendant Correctional Health Services, Inc.;

6. Defendants', Correctional Health Services, Inc., Dr. Pettis, Dr. Beckett, and Mary Franks, motion for summary judgment is **GRANTED** as to plaintiff's claims under § 1983 against defendant Pettis;

7. Defendants', Correctional Health Services, Inc., Dr. Pettis, Dr. Beckett, and Mary Franks, motion for summary judgment is **DENIED** as to plaintiff's claims under § 1983 against defendant Beckett;

8. Defendants', Correctional Health Services, Inc., Dr. Pettis, Dr. Beckett, and Mary Franks, motion for summary judgment is **DENIED** as to plaintiff's claims under § 1983 against defendant Franks;

9. The summary judgment motion of all defendants is **GRANTED** with respect to plaintiff's § 1983 claims based upon the October 7, 1997 assault;

10. Plaintiff's Second Claim for Relief in his Amended Complaint is **DISMISSED WITH PREJUDICE;**

11. Remaining in this case are plaintiff's claim under § 1983 against defendants Beckett, Shagren and Franks.