Helen EDWARDS, et al., Plaintiffs,

v.

ACADIA REALTY TRUST, INC., et al., Defendants.

No. 6:99–CV–110ORL28KRS.

United States District Court,
M.D. Florida,
Orlando Division.

March 9, 2001.

---

Mark E. Tietig, Tietig & Tietig, Merritt Island, FL, for Helen Edwards, Christopher Edwards, plaintiffs.

J. Scott Kirk, Christa C. Werder, Rumberger, Kirk & Caldwell, P.A., Orlando, FL, David V. Kornreich, Jeffrey E. Mandel, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Orlando, FL, Dwight W. Severs, City Attorney, City of Titusville, John H. Evans, Law Office of John H. Evans, Titusville, FL, Vincent M. D'Assaro, Kenneth Blair Rugh, D'Assaro and Hall, P.A., Orlando, FL, Michael Fertig, Christine L. Welstead, Alise Johnson, Akerman, Senterfitt & Eidson, Miami, FL, for Acadia Realty Trust, Inc., City of Titusville, Florida, Searstown Mall Association, Wells Fargo Guard Service, Inc. of Florida, defendants.

**ORDER**

ANTOON, District Judge.

Plaintiffs brought this action alleging that their rights were violated as a result of their opposition to racial discrimination by Defendants against third parties. In Plaintiffs' Third Amended Complaint (Doc. 57), Plaintiffs alleged five counts against four Defendants—Acadia Realty Trust, Inc. ("Acadia"), Wells Fargo Guard Ser-

vice, Inc. of Florida ("Wells Fargo"), Searstown Mall Association, Inc. ("STMA"), and the City of Titusville ("Titusville"). The claims against STMA and Titusville have been settled, leaving only Acadia and Wells Fargo as Defendants herein. Additionally, this Court previously dismissed Counts III, IV, and V of the Third Amended Complaint as well as a portion of Count II (Order, Doc. 207). The only remaining claims are Count I (race-based denial of public accommodation under 42 U.S.C. § 1981) and part of Count II (violation of free speech rights— 42 U.S.C. § 1983).

This cause is now before the Court on several motions for summary judgment and partial summary judgment: Plaintiffs' Motion for Partial Summary Judgment Against Defendants Acadia Realty Trust, Searstown Mall Association, and Wells Fargo of Florida Guard Services (Doc. 98); Defendant, Acadia Realty Trust Inc.'s Motion for Final Summary Judgment and Supporting Memorandum of Law (Doc. 106); Defendant Wells Fargo Guard Services, Inc.'s Response in Opposition to Plaintiff's Motion for Partial Summary Judgment and Dispositive Cross Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 139); and Plaintiffs' Second Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 178). Upon consideration of the record in this matter, oral argument presented by the parties on January 12, 2001, and pertinent case law and as more specifically set forth below, the Court concludes that there are no genuine issues of material fact remaining, that Plaintiffs' motions should be denied, that Defendants' motions should be granted, and that judgment should be entered in favor of Defendants on all remaining claims in this matter.

## I.  Factual Background [1]

Plaintiffs are residents of Titusville, Florida and are "not of the Negro race." (Third Amended Complaint, Doc. 57, ¶ 2). The SearsTown Mall in Titusville has numerous tenants, including Sears, a beauty supply store, a State of Florida unemployment office, a movie theater, and at least one restaurant. Defendant Acadia owned the mall until late January or early February 1999, at which time the mall was sold to Defendant STMA. Defendant Wells Fargo provided security services for the mall.

On the evening of November 20, 1998, Plaintiffs went to the mall with their two sons and a friend of their sons. While the boys saw a movie, Plaintiffs ate dinner at a mall restaurant. While they ate, they noticed five black girls—ranging in age from five years to mid- to late teens—eating in an adjacent booth. Plaintiffs describe the girls, who were not accompanied by an adult, as well-behaved in the restaurant.

After finishing dinner, Plaintiffs walked through the mall, browsed in the Sears store, and then sat down on a bench outside the movie theater to wait for their children. As the Edwardses were proceeding from Sears to the bench, they observed the five black girls whom they had seen in the restaurant standing nearby. Two security guards approached the girls, and one of the guards asked the girls in an authoritative voice what their business was. The girls responded that they were waiting for their parents, and the guard told the girls they needed to leave. According to the Edwardses, the oldest

---

1.  The facts are largely undisputed; in areas of dispute, unless otherwise noted Plaintiffs' version of events has been conveyed.

girl told the guard that they needed to wait inside until their parents came to pick them up. The guard replied that he did not care and that the girls needed to "get [their] asses out of here"; Mrs. Edwards testified in her deposition that the guard used the term "black asses" although Mr. Edwards did not report this terminology. The girls then walked outside the mall.

The Edwardses sat on a bench for ten to fifteen minutes waiting for their children to emerge from the movie theater. While they sat there, the security guards approached two or three unaccompanied teenage black boys in front of the movie entrance. One guard asked the boys what they were doing. When one of the boys responded that they were going to the movies, the guard replied, "Then you need to get there." The boys went into the movie theater. At that time, Mrs. Edwards did not feel that the guards had treated the boys improperly (Helen Edwards Dep., Doc. 111, at 48).

Just after the black boys walked into the movie theater, and while the Edwardses were still seated on the bench outside the theater, the five black girls came back inside the mall and walked toward the telephone behind the Edwardses. The girls made a telephone call and then proceeded into a nearby retail store. The guards followed the girls into the store, about three or four feet behind. The girls looked around in the store and then left, with the guards still following them. One guard again told the girls that they needed to go outside, and the girls then exited the mall.

As the guards were following the black girls out of the retail store, Mrs. Edwards asked the guards if the girls had done something wrong. One guard told Mrs. Edwards it wasn't any of her business. Mrs. Edwards pointed out that the girls had told the guards they were waiting for their parents and were not supposed to be outside. The guard responded, "They don't belong here" or "They have no business here." Mrs. Edwards told the guard that she had watched the guard follow the girls around and throw the girls out twice and opined that the guard was discriminating against the girls based on their race. The guard told Mrs. Edwards to shut her mouth and stay out of it. Mrs. Edwards told the guard he had no right to tell her to shut her mouth. According to the Edwardses, the guard then pulled out his flashlight, put it in Mrs. Edwards's face, and again told her to shut her mouth or he would have a trespass warning issued against her. Mr. Edwards then told the guard to leave Mrs. Edwards alone. The guard said he was going to call the police and left.

The Edwardses saw other children in the mall that evening, but they have identified only two other sets of unaccompanied children—one group of white children sitting on a bench eating pizza purchased at the restaurant and one group of white girls who made a phone call. The white girls were, according to the Edwardses, the loudest group in the mall, and they asked the Edwardses for change for the phone, which the Edwardses provided. The Edwardses did not complain about the children, and the Edwardses had no knowledge as to whether the guards saw those unaccompanied groups of children that evening or whether the guards inquired about their business or escorted them outside at some point that night.

According to the security guard, Andrew Bankowski, the black girls had told him they were supposed to have gone to a 7:00 movie but they instead had left the mall and came back inside at about 8:15. When the girls went into the store, a sales clerk in the store motioned for him to go into the store and he did so and then followed

the girls out. Bankowski stated in his deposition that he was taking the children outside because the movies were about to let out and the security guards oversee children outside for their safety and security. Bankowski explained that it is better from a security standpoint for the children to be in the well-lighted area outside where the security guards can observe them directly. Additionally, parents picking up their children park outside and do not want to have to go inside the mall to retrieve their children. Bankowski tried to explain the situation to Mrs. Edwards when she confronted him, but she would not listen; Mrs. Edwards acknowledged in her deposition that she "didn't give [Bankowski] a chance" to explain his actions (Helen Edwards Dep., Doc. 111, at 66).

After Bankowski left to call the police, the Edwardses' children came out of the movie theater and they all proceeded to the parking lot. The police had arrived, and they issued a trespass warning against the Edwardses, barring them from returning to the mall premises for two years. When the Edwardses asked the reason for the trespass warning, the police said it was because the guards had requested that the trespass warning be issued. According to the Edwardses, they explained to the officers that the guards had requested the trespass warning because of their opposition to the harassment of the black girls. The police officer suggested that the Edwardses contact the mall management the next day to straighten out the matter of the trespass warning.

The Edwardses did not contact the mall the next day as suggested by the police officers, nor did they complain to the police, the city, or Wells Fargo. Instead, the Edwardses consulted with an attorney. The instant lawsuit was filed in this court on February 1, 1999 (Doc. 1). On February 9, 1999—after the instant case had been initiated—Mr. Edwards for the first time called Debra Hardy, the manager of the mall,[2] to request rescission of the trespass warning (Christopher Edwards Dep., Doc. 109, at 175). It is undisputed that the trespass warning was revoked about ten days later.

Mrs. Edwards testified at her deposition that neither she nor her family had any other encounters with the mall security guards before or after the November 1998 incident except on one occasion after the trespass warning had been rescinded.[3] In the later incident, her sons and nephew were walking through the mall while Mr. and Mrs. Edwards ate dinner at a mall restaurant. The security guards approached the unaccompanied Edwards children and told them to get back with their parents. There was no indication to Mrs. Edwards that the guard recognized the children as hers or that the guard's actions on that occasion were motivated by skin color. Mrs. Edwards testified that the day the security guards approached her children was the only time her children had been in the mall unaccompanied by an adult.

## II.  Legal Discussion
### Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

**2.** Hardy was employed as the mall manager at all relevant times hereto—she was employed by Acadia at the time of the November 20, 1998 incident, and after the mall was sold in early 1999 she continued as mall manager in the employ of STMA.

**3.** This incident apparently occurred around Thanksgiving 1999.

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In ruling on a motion for summary judgment, "[t]he function of the court is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial.'" *Lockett v. Wal–Mart Stores, Inc.,* 2000 WL 284295, *2 (S.D.Ala. Mar.8, 2000) (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505).

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.,* 131 F.3d 995, 999 (11th Cir. 1997). "The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir.1991); *see also* Fed. R.Civ.P. 56(e) (providing that nonmovant's response "must set forth specific facts showing that there is a genuine issue for trial").

*Count I—Race–Based Denial of Public Accommodation Under 42 U.S.C. § 1981*

In Count I of their Third Amended Complaint, Plaintiffs bring claims against Acadia and Wells Fargo for race-based denial of a public accommodation under 42 U.S.C. § 1981.[4] Plaintiffs contend that they were denied the right to full and equal benefit of the laws when they were issued the trespass warning and banned from the mall.

■ In order to prevail on a claim under section 1981, a plaintiff must establish, inter alia, intentional race-based discrimination. As the court noted in *Smith v. Dallas County Bd. of Educ.,* 480 F.Supp. 1324 (S.D.Ala.1979):

The [s]ine qua non of a complaint under section 1981 is a showing of racial discrimination....

The Court recognizes that motive and intent are crucial in determining whether an alleged violation of section 1981 has occurred. But just because racial animus is important, that does not suspend the application of Rule 56. In response to the motion for summary judgment the plaintiffs presented no sig-

---

4. This section provides:

  (a) Statement of equal rights

    All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

  (b) "Make and enforce contracts" defined

    For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

  (c) Protection against impairment

    The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

nificant probative evidence either to support the allegations of racial discrimination in the complaint or to show that a genuine issue as to a material fact exists. Simple dissatisfaction with the results of the testing does not translate into racial discrimination. The Court is satisfied that whatever the results of the academic placement testing is in Dallas County no racial animus is present. Accordingly, the defendants' motion for summary judgment as to the section 1981 claim is granted.

480 F.Supp. at 1336 (citations omitted).

■ In the instant case, as in *Smith*, Plaintiffs have failed to present any evidence creating a genuine issue of fact as to racial animus. First, as to Acadia, there is absolutely no evidence of discriminatory intent or even any involvement in the November 20, 1998 incident. There was no mall manager present at the time of the incident, and Plaintiffs had no contact with anyone at the mall until February 1999—after which the trespass warning was soon rescinded. Plaintiffs have presented no evidence of a mall policy to discriminate, and there is no evidence that Acadia directed Wells Fargo to act in a discriminatory manner, acted in concert with Wells Fargo, or was even aware of Bankowski's alleged discriminatory actions until Mr. Edwards called Hardy in February 1999 to have the trespass warning rescinded. Hence, there is no evidence that Acadia acted with the discriminatory intent required for recovery under section 1981.

■ As to Wells Fargo, the record evidence—including the statement by Mrs. Edwards that her own, white children were asked to go back to their parents by the security guards on the only occasion when they were not accompanied by an adult—points to neutral actions by the guards regarding *unaccompanied children* in general rather than *children of a cer-*

*tain race or color.* The fact that the Edwardses saw the security guards—during approximately fifteen minutes seated on a bench in one particular area of the mall—question two groups of unaccompanied black children regarding their business at the mall and ask the girls to wait outside does not in and of itself constitute probative evidence of racial discrimination. Plaintiffs admit that they did not feel that the guards acted improperly toward the boys, that they have no knowledge or evidence of whether the guards noticed any other groups of unaccompanied children that evening, and that they have no knowledge or evidence of whether the guards in fact escorted any other children out of the mall on the evening of the incident. At best, Plaintiffs have presented a mere scintilla of evidence of intent, which is not sufficient to preclude summary judgment. In short, no reasonable jury could find discriminatory intent on this record. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *accord Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997); *see also Bibbs v. Bd. of Trs.,* 9 F.Supp.2d 964, 973–74 (N.D.Ill.1998) (granting summary judgment where there was "not a scintilla of evidence" of racial animus and "the undisputed evidence would not allow a reasonable jury to return a verdict in support of [the] claim of racial discrimination"), *aff'd,* 191 F.3d 455 (7th Cir.1999); *cf. Brantley v. Runyon,* 1999 WL 195658, *4 (6th Cir. Mar.8, 1999) (noting that plaintiff's contention that supervisor's "perception was based on racial stereotyping is sheer speculation and conjecture"); *Reyes v. City of Dinuba,* 1992 WL 289553, *1 (9th Cir. Oct.14, 1992) (affirming summary judgment where "racial animus [could] not reasonably be inferred

from the evidence"); *Zephyr v. Ortho McNeil Pharm.*, 62 F.Supp.2d 599, 607 (D.Conn.1999) (granting summary judgment where case "present[ed] the Court with nothing more than pure and legally inadequate speculation that racial animus motivated the alleged discriminatory treatment of the plaintiff"); *Brady v. Cheltenham Township*, 1998 WL 164994, *7 (E.D.Pa. Apr.9, 1998) (finding that "scintilla of circumstantial evidence, absent more, is insufficient to support a rational jury's inference of racial discrimination" and that "[t]he evidence presented fail[ed] to bolster plaintiffs' conclusory allegations of racial animus, which are inadequate to create an issue of fact that would prevent the court from granting summary judgment" on section 1981 claims); *Sampson v. Vill. Disc. Outlet, Inc.*, 832 F.Supp. 1163, 1167 (N.D.Ill.1993) ("[T]he commission of an offense accompanied by a single racist remark will not sufficiently demonstrate that a racial animus was a motivating factor of the offense."), *aff'd*, 43 F.3d 1474 (7th Cir. 1994).

Furthermore, Plaintiffs' argument that Bankowski had them banished in retaliation for their opposition *to what they believed in good faith* to be racial discrimination is unavailing. Plaintiffs' reaction under the circumstances was based on nothing more than an assumption that Bankowski was acting with racial animus when he escorted the girls out of the mall. The law does not elevate the rights of non-minority observers over those of minority members who suffer no discrimination. In other words, Plaintiffs have no greater rights than the children from whom their claim stems, and therefore their "good faith belief" rings hollow once it is shown, as here, that there is no significant probative evidence of underlying discrimination. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims under 42 U.S.C. § 1981.[5]

*Count II—Violation of Plaintiffs' Free Speech Rights under the First and Fourteenth Amendments/42 U.S.C. § 1983*

In Count II, Plaintiffs claim under 42 U.S.C. § 1983[6] that Defendants' actions violated their free speech rights under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs seek relief from Wells Fargo and Acadia based on the actions of the employees of these entities—security guard Andrew Bankowski and mall manager Debra Hardy, respectively.

■ As the Eleventh Circuit has noted, "A defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir.1992) (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). This rule applies to both municipal and private corporations. *Harvey*, 949 F.2d at 1130.[7]

■ However, a corporation may be held liable for the unconstitutional acts of employees where there is a policy, custom,

5. The Court's disposition of the issue of racial animus renders moot the other issues pertinent to the section 1981 claims.

6. This section provides in relevant part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

7. The Court declines Plaintiffs' invitation to reject prevailing law on this point and to adopt a new rule allowing respondeat superior liability for private corporations in section 1983 cases. Plaintiffs cite *Taylor v. Plousis*, 101 F.Supp.2d 255 (D.N.J.2000), for the prop-

or action by those who represent official policy which causes the injury. *See, e.g., Davis v. DeKalb County Sch. Dist.,* 233 F.3d 1367, 1375 (11th Cir.2000) (noting that for municipality to be liable under section 1983 acts must be "acts which the municipality has officially sanctioned or ordered"); *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991) ("[I]n order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or harassment occurred pursuant to a custom or policy of the municipality."); *Scutieri v. Estate of Revitz,* 683 F.Supp. 795, 800 (S.D.Fla.1988) (noting "exception to rule of no vicarious liability under Section 1983 where there is policy-making employee and there was a policy which was the moving force of the constitutional violation"). Although this Court found in ruling on the motions to dismiss that Plaintiffs had sufficiently *alleged* a custom or policy by the Defendants, the Plaintiffs have not *presented evidence* sufficient to survive the Defendants' motions for summary judgment on this issue. Considering the affidavits and depositions in the record, there is simply no evidence supporting Plaintiffs' claims that the actions taken by the individual employees of these corporate defendants constitute the official policies of those entities. Accordingly, the Plaintiffs' section 1983 claims fail.

■■■■ The Court agrees with Defendants that Plaintiffs have not presented

any evidence supporting their claim that Bankowski and Hardy implemented a policy, custom, or practice of their employers to discriminate based on race or to retaliate against those who oppose such discrimination. First, as discussed above in connection with the section 1981 claim, there is no evidence that Hardy or anyone at Acadia participated in the November 20, 1998 incident or was even aware of the alleged discrimination until after this suit was filed. Hence, even assuming arguendo that Hardy is a policy-making employee—a conclusion which is not supported by the evidence—there are no actions by Hardy which could trigger liability for Acadia, nor is there any evidence of a discriminatory Acadia policy. Additionally, there is no support in the record for Plaintiffs' contention that Wells Fargo's security guard, Bankowski, was a policy-making employee or that he acted pursuant to a corporate policy of discrimination. Plaintiffs' bare, conclusory allegations of the existence of such a policy are insufficient to raise an issue of fact, and Defendants have met their burden of establishing the absence of a genuine issue of material fact as to the existence of a custom or policy. Accordingly, Defendants' motions for summary judgment on the section 1983 claims shall be granted.[8]

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

---

osition that respondeat superior liability should apply to private corporations even though it does not extend to governmental entities. In a footnote, the *Taylor* court did question the policy behind extension of *Monell* to private corporations. 101 F.Supp.2d at 263 n. 4. However, the court acknowledged that "the majority of courts to have considered the issue have determined that ... a [private] corporation may not be held vicariously liable under § 1983" and "accept[ed] the reasoning in these cases." 101 F.Supp.2d

at 263. If the rule is to be changed in this circuit, that task is for the Court of Appeals. *Cf. Scutieri v. Estate of Revitz,* 683 F.Supp. 795, 800 (S.D.Fla.1988) (discussing *Monell* and holding that "as a matter of law[ ] a private corporation cannot be liable strictly on the basis of a respondeat superior theory under Section 1983").

8. In light of the disposition of the respondeat superior liability issue, the Court finds it unnecessary to reach the remaining issues on the section 1983 claims, including Plaintiffs'

1. Defendant, Acadia Realty Trust Inc.'s Motion for Final Summary Judgment (Doc. 106) is **GRANTED.**

2. Defendant Wells Fargo Guard Services, Inc.'s Dispositive Cross Motion for Summary Judgment (Doc. 139) is **GRANTED.**

3. Plaintiffs' Motion for Partial Summary Judgment Against Defendants Acadia Realty Trust, Searstown Mall Association, and Wells Fargo of Florida Guard Services (Doc. 98) is **DENIED.**

4. Plaintiffs' Second Motion for Partial Summary Judgment (Doc. 178) is **DENIED.**

5. All other pending motions are **DENIED as moot.**

6. The Clerk is directed to enter judgment for Acadia Realty Trust, Inc. and Wells Fargo Guard Service, Inc. of Florida in accordance with this Order and thereafter to close the file.

standing and whether Acadia and Wells Fargo were state actors in the context of this litigation.