## METROPOLITAN LIFE INSURANCE COMPANY, INC., Plaintiff,

v.

## Estate of Albert DUNN, Jr. & Estate of Irma S. Titus, Defendants.

### No. 6:02–CV–217–ORL–18DA.

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 5, 2003.

Ernest J. Myers, Unger, Webster & Acree, P.A., Martin B. Unger, Unger, Acree, Weinstein, Marcus, Merrill, Kast & Metz, PL, Orlando, for Metropolitan Life Insurance Company, Inc., plaintiff.

Ralph V. Hadley, III, Alvarez, Sambol, Winthrop & Madson, P.A., Orlando, Frank W. Heery, Englewood, CO, for Estate of Albert Dunn, Jr., Estate of Irma S. Titus A/K/A Irma Stretz Titus, defendants.

## ORDER

G. KENDALL SHARP, Senior District Judge.

Metropolitan Life Insurance Company ("Met Life") brought this interpleader action to determine the rightful recipient of Albert Dunn, Jr.'s ("Albert") annuity policy ("the Policy") benefits. Albert's Estate and his ex-wife Irma S. Titus' ("Irma") Estate dispute the identity of the rightful beneficiary.

This cause comes before the Court on:

1.  Irma's Estate's motion for summary judgment. (Doc. 21, filed 1 November 2002);

2.  Albert's Estate's response to Irma's Estate's motion for summary judgment (Doc. 23, filed 12 November 2002);

3.  Albert's Estate's motion in limine to strike Irma's Estate's endorsement of expert witnesses (Doc. 31, filed 16 January 2003);

4. Met Life's motion to schedule final pretrial conference and settlement conference (Doc. 34, filed 21 January 2003); and

5. Met Life's motion to deposit proceeds in the Court Registry and dismiss Met Life. (Doc. 35, filed 21 January 2003.)

## I. BACKGROUND

Met Life issued the Policy to Albert in August 1960. Albert and Irma married on 22 December 1977; the couple did not sign an antenuptial agreement. On 8 May 1978, Albert changed the Policy's beneficiary to Irma, a designation that remained unchanged until his death. Albert and Irma divorced on 24 April 1989, contemporaneously executing a marital settlement agreement ("Agreement") governed by Florida law. (Doc. 1, Exhibit 3 at ¶ 21.) A section of this Agreement entitled "Sole Ownership of Property" states:

(a) [Irma] shall be the sole owner of any and all property, real or personal, tangible or intangible, including, but not limited to, money market accounts, retirements accounts, annuities, stocks, bondds [sic], securities, brokerage accounts, or any other assets presently titled in the sole name of [Irma] that is not otherwise disposed of in this Marital Settlement Agreements.

(b) [Albert] shall be the sole owner of any and all property, real or personal, tangible or intangible, including, but not limited to, money market accounts, retirements accounts, annuities, stocks, bonds, securities, brokerage accounts, or any other assets presently titled in the sole name of [Albert] that is not otherwise disposed of in this Marital Settlement Agreements.

(c) Each party shall be entitled to any and all further retirement accounts, pensions, profit sharing plans, savings accounts, commodities, annuities or any other accounts in their respective names.

(Doc. 1, Exhibit 3 at ¶ 19(a-c).)

Another section of the Agreement entitled "Mutual Releases" states, in pertinent part:

Except as otherwise provided in this Agreement:

(b) Each party irrevocably release [sic] and relinquishes all claims, rights and interest which that party may now have or may hereafter acquire in any property, real, personal or mixed, owned by either of the parties at the time of their marriage or subsequently acquired, separately or together, and owned by parties, or either of them, at the time of their separation, which has heretofore been equitably divided and apportioned between them.

(*Id.* at ¶ 20(b).)

The Policy reached its "Normal Retirement Date" on 10 August 1984, following Albert's 65th birthday. Albert requested deferment on the Policy payments on 25 September 1984. (Doc. 26, Exhibit G.) The Policy reached its "Ultimate Retirement Date" on 10 August 1989, following Albert's 70th birthday. At this time, despite repeated attempts, Met Life could not locate Albert. (Doc. 1, Exhibit 4.) Albert never contacted Met Life regarding payment.

Albert died on 17 March 1996. Met Life finally located Albert's son in early 1999 and learned of Albert's death. After reviewing the beneficiary form, Met Life began searching for Irma. Met Life found Irma's representative in 2002 and learned she had died in April 2001. Both Albert and Irma's Estates, proceeding *pro se,*

claim the $196,527.82 Policy, plus over $41,000 in accrued interest.

Irma's Estate claims that although Albert had the power to change the Policy's beneficiary, his failure to do so entitles Irma's Estate to the proceeds. Albert's Estate claims that the Agreement extinguished Irma's or Irma's Estate's claims, and Policy distribution turns upon Albert's intent, a genuine issue of material fact.

Albert's Estate also argues that two other items present genuine factual issues sufficient to render summary judgment inappropriate. First, Albert's Estate cites Met Life's e-mail suggesting that Albert effectuated a beneficiary change in 1991. (Doc. 23, Exhibits C–D.) Second, Albert's Estate cites a different policy which states that Albert's retirement age was 69. (*Id.,* Exhibit A.) Albert's Estate argues that because Albert reached this age on 18 September 1987, he is entitled to the proceeds of the annuity that should have been distributed to him until his death.[1]

Recognizing confusion in the record, the Court ordered Met Life to file an authenticated copy of Albert's Policy after he changed the Policy's beneficiary to Irma on 8 May 1978, as well as any subsequent Policy updates, modifications, revisions, or amendments. This order included, but was not limited to, any beneficiary changes. (Doc. 32.) In response, Met Life filed an authenticated version of the Policy and noted that Albert's Estate referenced an invalid version of the Policy in its pleadings. (Doc. 35.) Moreover, Met Life referenced sworn testimony stating that no subsequent beneficiary changes occurred after 8 May 1978. (*Id.* at ¶ 2, *citing* Doc. 29 at ¶ 9.)

## II. DISCUSSION

### A. Summary Judgment Standard

A court will grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c); *See e.g., Edwards v. Acadia Realty Trust, Inc.,* 141 F.Supp.2d 1340, 1344–45 (M.D.Fla.2001). Material facts are those that may affect the outcome of the case under the applicable substantive law. Disputed issues of material fact preclude the entry of summary judgment, but factual disputes that are irrelevant or unnecessary do not. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Matsushita Elec. Ind. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party may rely solely on his pleadings to satisfy its burden. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. A non-moving party bearing the burden of proof, however, must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories or admissions that designate specific facts indicating there is a genuine issue for trial. *Id.* at 324, 106

1. Albert's Estate also claims that Albert's designation of Albert's Estate as the beneficiary of three unrelated annuities automatically dic-

tates that the Policy's value inures to Albert's Estate. This argument is meritless, and the Court declines to address it further.

S.Ct. 2548. If the evidence offered by the non-moving party is merely colorable, or is not significantly probative, the Court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Similarly, summary judgment is mandated against a party who fails to prove an essential element of its case. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### B. The Interpleader Action

Albert's Estate argues that three genuine issues of material fact preclude summary judgment: 1) the identity of Albert's intended beneficiary; 2) the effect of internal Met Life e-mail indicating a 1991 Policy beneficiary change; and 3) and the exact amount of money to which Albert's Estate is entitled due to the Policy's maturation prior to Albert's death. These arguments all fail; no genuine issues of material fact exist, and the Court must consequently grant summary judgment in favor of Irma's Estate.

### 1. Effect of the Agreement on the Policy's Beneficiary

■ Irma's Estate must prevail because the Agreement is insufficient as a matter of law to invalidate Irma's beneficiary status. *Cooper v. Muccitelli,* 661 So.2d 52, 54 (Fla. 2d DCA 1995) (*"Cooper I "*), *aff'd* 682 So.2d 77, 79 (Fla.1996) (*"Cooper II "*). Pursuant to the Agreement and the Policy itself, Albert possessed the exclusive right to change the Policy's beneficiary. As beneficiary, Irma possessed no vested rights or interests in the Policy during Albert's life; she merely possessed an expectation interest. *Id.* at 53 (*citing Moon*

*v. Williams,* 102 Fla. 214, 135 So. 555, 557 (1931)).

The *Cooper I* court held that "without *specific* reference in a property settlement agreement to life insurance *proceeds,* the beneficiary of the proceeds is determined by looking only to the insurance contract." *Id.* at 54 (emphasis added). In affirming this decision, the *Cooper II* court stated that a contrary holding would leave insurance companies in an untenable position: "the carrier could never be certain whom to pay in such a situation without going to court, in spite of what the policy said or how it was worded." *Cooper II,* 682 So.2d at 79.

In light of the *Cooper* decisions, the Court must analyze the Agreement to determine if it contains a "specific reference" to "insurance proceeds." [2] *Cooper I,* 661 So.2d at 54. The Agreement mentions the word "annuity" thrice in the "Sole Ownership of Property" section, but only references ownership and makes no mention of proceeds. (Doc. 1, Exhibit 3 at ¶ 19(a-c).) Additionally, the Agreement contains a "Mutual Release" section upon which Albert's estate heavily relies:

> Except as otherwise provided in this Agreement:
>
> (b) Each party irrevocably release [sic] and relinquishes all claims, rights and interest which that party *may now have or may hereafter acquire* in *any property,* real, personal or mixed, owned by either of the parties at the time·of their marriage or subsequently acquired, separately or

---

**2.** In contending that summary judgment is inappropriate, Albert's Estate solely cites inapplicable case law. The *Cooper I* court certified conflict between its decision and three other Florida district court of appeals decisions. *See Cooper I,* 661 So.2d at 54 (*citing Davis v. Davis,* 301 So.2d 154 (Fla. 3rd DCA 1974); *Aetna Life Ins. Co. v. White,* 242 So.2d 771 (Fla. 4th DCA 1970); *Raggio v. Richard-*

son, 218 So.2d 501 (Fla. 5th DCA 1969)). The *Cooper II* court upheld the result reached in *Cooper I. Cooper II,* 682 So.2d at 79.

Albert's estate cites one case in its response. *Hoffman v. White,* 277 So.2d 290 (Fla. 4th DCA 1973). *Hoffman* is the progeny of *White,* a case *Cooper II* found unpersuasive. Accordingly, the Court finds the Hoffman/*White* rationale unpersuasive.

together, and owned by parties, or either of them, at the time of their separation, which has heretofore been equitably divided and apportioned between them.

(*Id.* at ¶ 20(b) (emphasis added).)

This section does not reference insurance proceeds with the specificity demanded by the *Cooper* courts.[3] While in both instances, the settlement agreements allude to potential future property, neither specifically mentions insurance policy proceeds. The absence of these "magic words" is controlling.

Pursuant to the Agreement, Albert had the power to change the Policy's beneficiary for almost 30 years. He elected not to do so. Neither party introduces any evidence concerning Albert's motives in retaining Irma as the beneficiary, and the Court need not speculate into such matters given an unchanged Policy and an Agreement lacking legally mandated specificity. Contrary to Albert's Estate's assertions, no genuine issue of material fact exists concerning Albert's intent. As such, Irma's Estate is entitled to the Policy's proceeds as a matter of law.

### 2. The Met Life E–Mail

██ Albert's Estate's contention that purported evidence of a 1991 Policy beneficiary change creates a factual dispute is similarly misplaced. In support of this contention, Albert's estate cites Met Life internal e-mail in which a Met Life employee refers to a 1991 Policy beneficiary change. (Doc. 23, Exhibits C–D.) At first glance, this "evidence" is compelling—if Albert had in fact changed beneficiaries in

1991, transferring the expectation interest in the Policy to his estate, the proper result would be a grant of summary judgment in favor of Albert's Estate.

Upon closer inspection, however, the argument is groundless. Albert's Estate omits a subsequent Met Life letter to Albert's Estate stating that the e-mail were based on an inaccurate premise, and no 1991 Policy beneficiary change really existed. (Doc. 26, Exhibit F.) Furthermore, no party is able to produce a certificate of this purported beneficiary change. Pursuant to the Policy's strict terms, all beneficiary changes must be made in writing and filed with Met Life. (Doc. 36, Exhibit 1 at 3.) Concerned with the possible presence of such a crucial document, the Court ordered Met Life to produce any beneficiary changes made by Albert after 1978. (Doc. 32.) Met Life attested that none existed. (Doc. 35.) Albert's Estate nevertheless argues that the e-mail creates a genuine issue of material fact.

A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The Court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. The Court is faced with the latter situation. The record evidence is so clear-cut as to mandate summary judgment; no reasonable jury could return a verdict for Albert's Estate based on the cited e-mail.

---

**3.** The property settlement agreement at issue in *Cooper I and II* was very similar to the one currently before the Court:

  6. Mutual Release and Discharge of Claims in Estates

  Each party, individually and for his or her heirs, personal representatives, executors, administrators, successors and

assigns, hereby waives, releases and relinquishes any and all claims, rights or interests as a surviving spouse in or to any property, real or personal, *which the other party owns or possesses at death, or to which the other party or his or her estate may be entitled.*

*Cooper II,* 682 So.2d at 78 (emphasis added).

### 3. Albert's Entitlement to the Policy's Proceeds Before Death

■ Finally, Albert's Estate improperly claims that Albert became entitled to the Policy's proceeds at some time previous to his death, and the exact amount of these proceeds creates a factual dispute. Although the parties dispute the exact date upon which the Policy matured, no party disputes that this date occurred years before Albert's death. Theoretically, if Albert had contacted Met Life, he could have collected on a substantial portion of the Policy before he died in 1996. It is undisputed, however, that he did not contact Met Life. Consequently, the Court must determine whether Albert had a vested property interest in this unclaimed money.

Undisputed evidence demonstrates that Met Life contacted Albert in September 1984, following his 65th birthday. (Doc. 26, Exhibit G.) At this time, Albert could begin collecting on the Policy. He expressly refused to do so, and the Policy continued to garner interest. (*Id.*) Despite repeated attempts, Met Life was not able to contact Albert before his death, and Albert never contacted Met Life.

Florida law states that funds held under any matured annuity contract are presumed unclaimed if they are not claimed within five years of the annuity contract's maturity. Fla. Stat. § 717.107. It is undisputed that the Policy matured at least five years before Albert's death, and the proceeds went unclaimed. Accordingly, Albert's Estate's argument that Albert had a vested property interest in the Policy's proceeds is inaccurate, and no factual dispute exists. The Policy's proceeds continued to accrue interest and Albert reaped this benefit until his death. Through failure to claim the benefit, however, Albert forfeited his rights to the Policy's proceeds to his designated beneficiary.

### III. CONCLUSION

For the foregoing reasons, Irma's Estate's motion for summary judgment (Doc. 21, filed 1 November 2002), is **GRANTED**. Met Life's motion to deposit proceeds in the Court Registry and for dismissal (Doc. 35, filed 21 January 2003), is **GRANTED IN PART** and **DENIED IN PART**. Met Life is ordered to deposit the Policy's proceeds of $196,527.82, plus interest calculated for a Pennsylvania beneficiary, within ten (10) days of the issuance of this Order. At that time, Met Life may re-file its motion for dismissal. All other pending motions are **DENIED AS MOOT**. Irma's Estate shall provide the Court with its current mailing address and the manner by which the Policy should be distributed from the Court Registry.