**ALTADIS USA, INC., individually and for the use and benefit of Gulf Life Insurance Co., Plaintiffs,**

v.

**NPR, INC., doing business as Navieras De Puerto Rico; B–Right Intermodal Transport, Inc.; B–Right Trucking, Inc.; Key Bank, N.A.; National Union Insurance Company of Pittsburgh, Defendants.**

No. 3:02–CV–660–J–16MCR.

United States District Court, M.D. Florida. Jacksonville Division.

Aug. 25, 2004.

G.J. Rod Sullivan, Jr., Thomas Albert Boyd, Jr., Sullivan, Boyd & Goldsberry, Jacksonville, FL, for Plaintiffs.

Curtis Hugh Blanton, Jr., Kosto & Rotella, P.A., Jacksonville, FL, for Defendant and Cross–Claimant.

Sidney N. Freeman, Law Offices of Sidney N. Freeman, Uniontown, OH, for Defendant.

## ORDER

JOHN H. MOORE, District Judge.

Before the Court are two motions for summary judgment filed by the remaining Defendants in this case.[1] Defendant Na-

1. By Order of July 29, 2004 (Dkt. 131), this Court entered Final Default Judgment in favor of the Plaintiffs and against Defendants B–Right Trucking, Inc. and B–Right Intermodal Transport, Inc., jointly and severally, in the amounts of $30,475.47 (in favor of Altadis) and $604,718.08 (in favor of Gulf Insurance Company). Then, by Notice of August 13, 2004 (Dkt. 151), Altadis notified the Court that it had reached a settlement of its claims

tional Union Insurance Company of Pittsburgh ("National") filed its Motion for Summary Judgment Against Plaintiff and NPR, Inc. (Dkt. 105), to which both the Plaintiffs and NPR, Inc. ("NPR") have filed responses in opposition (Dkts. 141 & 144). Defendant Key Bank, N.A. ("Key Bank") filed its Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. 120), to which the Plaintiffs responded by filing a document entitled "Motion and Memorandum of Law to Deny Defendant Key Bank, N.A.'s Motion for Summary Judgment" (Dkt. 140), which the Court construes as the Plaintiffs' opposition to Key Bank's Motion. Because the Plaintiffs styled their response to Key Bank's Motion for Summary Judgment as a "motion to deny," however, Key Bank filed a Memorandum in Opposition to the Plaintiffs' "Motion" (Dkt. 145).

National has also filed a Motion to Strike Plaintiffs' Response to Motion for Summary Judgment (Dkt. 147), along with a Request for Oral Argument (Dkt. 146) on its Motion. Additionally, all of the parties have filed extensive affidavits, depositions, and documentary evidence in support of their motions and oppositions.

## I. Background

The Plaintiffs filed their fifteen-count Second Amended Complaint (Dkt. 84) on February 13, 2004, stating claims against the various Defendants for breach of contract, third party beneficiary of contract, negligence, breach of fiduciary duty, conversion, theft, and intentional interference with business relations. The claims arise out of a scheduled July 3, 2001 shipment of 2,505 cartons of cigars from Puerto Rico, where they were delivered to common carrier NPR (Navieras), to Tampa, Florida,

where they were to be received by Altadis, which was the holder of the bill of lading and owner of the shipment.

According to the Plaintiffs, NPR agreed to ship the cigars to Tampa, but it failed to deliver the cargo in like condition, as the entire shipment was instead lost by the Defendants. Altadis alleges that it also contracted with B–Right Intermodal Transport, Inc. and B–Right Trucking, Inc. (collectively referred to as "B–Right") on July 6, 2001 to transport the 40–foot container of cigars from the NPR terminal at Blount Island, Jacksonville, Florida, to the Altadis warehouse in Tampa, Florida. The cargo was allegedly stolen somewhere between Jacksonville and Tampa when it was negligently left by B–Right in an unattended parking lot over the weekend.

The Plaintiffs further allege that B–Right received settlement funds for the lost cargo from its insurance company, National. These funds were allegedly to be paid to Altadis, but B–Right failed to pay the settlement to Altadis as the owner of the lost shipment. The Plaintiffs assert a right to receive these funds as a third party beneficiary of the insurance contract between B–Right and National. The Plaintiffs allege that B–Right nonetheless kept possession of the funds and refused to pay Altadis or hold the funds in trust for its benefit, instead ultimately depositing the funds in its regular checking accounts at Key Bank, a foreign corporation with its principal place of business in Cleveland, Ohio.

The Plaintiffs allege that Key Bank knew that the settlement funds were to be held in trust for the benefit of Altadis, but the bank nonetheless induced, instructed or directed B–Right to commingle the

against Defendant NPR. As part of this settlement, NPR agreed to withdraw its pending Motion for Partial Summary Judgment with Supporting Memorandum of Law and Re-

quest for Oral Argument (Dkt. 123), as well as its previously-filed Motion to Strike Plaintiffs' Jury Trial Demand (Dkt. 142). Accordingly, these motions will be denied as moot.

funds with the funds deposited in its normal checking account, under the bank's threat of discontinuing B–Right's line of credit previously granted. The Plaintiffs claim that Key Bank therefore tortiously interfered with the agreement B–Right had with its insurer, National, to keep the settlement funds in trust for the benefit of Altadis.

The two remaining Defendants now claim entitlement to judgment as a matter of law, arguing both that the Plaintiffs cannot legally maintain their claims against either the bank or the insurance company, and that in any event, any claims against the defendants should be limited in value to the $500 amount stated in NPR's bill of lading for the container of cigars. Upon review of all the evidence presented by the parties, the Court will address each of the Defendant's motions separately below.

## II. Summary Judgment Standard

The Court should grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact [such] that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987); *Edwards v. Acadia Realty Trust, Inc.*, 141 F.Supp.2d 1340, 1344–45 (M.D.Fla.2001). The Court will construe the record and all inferences that can be drawn from it in the light most favorable to the nonmoving party, and the moving party bears the initial burden of establishing the absence of a genuine material fact. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). Once this burden is met, how-ever, the opposing party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. The Eleventh Circuit explained in *Samples* that the opposing party need only present evidence from which a jury might return a verdict in its favor in order to survive the moving party's motion for summary judgment. *See Samples*, 846 F.2d at 1330; *see also Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir.1988).

Notably, the Supreme Court pointed out in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), that the moving party's burden only extends to facts that might affect the outcome of the lawsuit under the governing law, as "[f]actual disputes that are irrelevant or unnecessary will not be counted." Summary judgment will only be granted if all facts and inferences point overwhelmingly in favor of the moving party, such that a responsible jury could not find in favor of the opposing party. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). If there is conflicting evidence that will permit differing reasonable inferences, the case will be submitted to the jury. *See Augusta Iron & Steel*, 835 F.2d at 856.

## III. Discussion

A. *National's Motion for Summary Judgment Against Plaintiffs and NPR*

In its Motion, National primarily argues that judgment should be granted in its favor because under Ohio law (where the policy of insurance was delivered), neither the Plaintiffs nor NPR, as non-insureds,

can seek direct damages against National, an insurer with a policy held solely by B–Right. *See, e.g., Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.,* 363 F.3d 1089 (11th Cir.2004); *Fioretti v. Mass. Gen. Life Ins. Co.,* 53 F.3d 1228, 1235–36 (11th Cir.1995); Dkt. 105, pp. 9–10. National asserts that because there is no contractual or Ohio statutory authority authorizing a direct action by the Plaintiffs or NPR against National, there is no privity as a matter of law to support this action against the insurer. *See also Kwait, McClatchy, Chaisson & Buchman, Inc. v. Expo Homes, Inc.,* 1980 WL 354323, 1980 Ohio App. LEXIS 13722 (1980); Dkt. 105, pg. 10.

Moreover, National argues that neither the Plaintiffs nor NPR are third-party beneficiaries under the policy of insurance, and therefore National owed no duty to these non-insureds. National argues that its responsibility under the policy was discharged at the time it made payment to B–Right, the insured, without any objection from either the Plaintiffs or NPR. Lastly, even if National could be held responsible for paying the loss to either Altadis or NPR, it argues that its liability should be limited to $500 per container, as set forth in NPR's bill of lading covering the lost shipment.

According to National, B–Right notified the insurer of the theft of cigars on July 9, 2001, forwarding demand letters from both NPR and Altadis related to the lost cargo, which was valued at $375,012.22. In November 2001, B–Right then sent a letter to National requesting that the settlement check be made payable to B–Right, and National subsequently cut a check payable to B–Right in the amount of $375,012.22. National claims that Altadis' agent was made aware that payment was being made directly to B–Right, and he did not specifically object to this method of payment, even though he was aware that B–Right

had an outstanding monetary dispute with NPR. Dkt. 105, pp. 5–6; Roberta Ansell Deposition. National claims that NPR also never objected to the settlement check being made out directly to B–Right, and therefore, like Altadis, it waived any right to now seek payment from National. *Id.* at pg. 13; Ladner Deposition.

As neither the Plaintiffs nor NPR were parties to the insurance policy between B–Right and National, and neither were intended beneficiaries of this policy, National therefore claims that they cannot seek breach of contract damages based on its failure to pay the proceeds directly to Altadis and/or NPR. National points to the policy as explicitly stating that no party other than the insured shall benefit from the insurance, and any settlement of losses will be solely between the insurer and the insured, with the insured retaining the "privilege, but not the obligation," to settle its loss with the owner of the cargo. Dkt. 105, pp. 7–8; *see also Brockway–Smith Co. v. Boston & Maine Corp.,* 497 F.Supp. 814 (D.Mass.1980). As such, National argues that any obligations it had under the contract were properly extinguished upon payment of the settlement proceeds to its named insured, B–Right. Dkt. 105, pp. 12–13; *see also Bennett v. Swift & Co.,* 170 Ohio St. 168, 163 N.E.2d 362 (1959).

Lastly, even if National could be held liable for payment of the insurance proceeds directly to Altadis or NPR, National argues that its liability should be limited to $500 per package under NPR's bill of lading, as provided in the Carriage of Goods by Sea Act ("COGSA") and the Harter Act, 46 U.S.C.App. § 1304(5) and 46 U.S.C.App. § 190, *et seq.,* respectively. According to National, COGSA was expressly incorporated into NPR's bill of lading, including its $500 package limitation, and COGSA's benefits were extended to non-carriers such as B–Right through the

inclusion of a Himalaya clause in the bill of lading. Dkt. 105, pp. 14–15; *Mikinberg v. Baltic S.S. Co.*, 988 F.2d 327 (2nd Cir. 1993); *Certain Underwriters at Lloyds' v. Barber Blue Sea Line*, 675 F.2d 266, 270 (11th Cir.1982). Accordingly, as NPR's bill of lading was a "through bill of lading" from Puerto Rico to Tampa, National claims it is entitled to B–Right's benefits under the Himalaya clause, including the $500 per-package limitation of liability. *See also Barretto Peat, Inc. v. Luis Ayala Colon Sucrs., Inc.*, 896 F.2d 656 (1st Cir. 1990); *Classic Fashions, Inc. v. NPR, Inc.*, 68 F.Supp.2d 1312 (S.D.Fla.1999).

■ The Court finds, however, that neither summary judgment nor a limitation of liability in favor of National is appropriate in this case. Initially, the Plaintiffs raise a question of fact as to whether Ohio law applies to the insurance agreement entered into between National and B–Right, as there is inconclusive evidence as to where the policy was issued. *See, e.g.,* Ansell Deposition, pg. 71. Moreover, the Plaintiffs have presented triable issues as to whether National's policy is meant to provide coverage for the loss of goods owned by third parties, in this case Altadis' cigars. Even if Ohio law applies, the Plaintiffs contend that the policy covers B–Right's liability for cargo loss while acting as a carrier, and Ohio law provides for insurer liability to the Plaintiffs as owners of the cargo, in the event they obtain a judgment against B–Right. Dkt. 141, pg. 4; Section 3929.06(A)(1), Ohio Code. As such, the Plaintiffs have raised sufficient questions as to whether they, as owners of the property, were intended third-party beneficiaries under National's carrier liability insurance policy with B–Right.[2] The Plaintiffs point out that they have already

obtained a judgment against B–Right, which is unpaid. The Court will not now grant judgment in favor of B–Right's liability insurer.

In addition, the Plaintiffs argue that the evidence raises material facts as to whether an agreement was reached between National's agent and NPR/B–Right, whereby Altadis was going to be paid for the loss of its cargo from the insurance proceeds. Under this alleged agreement, Altadis would be the third-party beneficiary as owner of the cargo. The Plaintiffs allege that this agreement was breached when National failed to either pay the $375,012.22 in proceeds directly to Altadis, or at least to ensure that the settlement funds were paid to Altadis. Taking these allegations in the light most favorable to the Plaintiffs for purposes of National's Motion, the Court finds that it is not entitled to judgment as a matter of law on these breach of contract theories. Dkt. 141, pg. 5; Ansell Deposition.

The Court also finds that the Plaintiffs have sufficiently demonstrated that they have not waived their right to seek damages against National in this case. Dkt. 141, pg. 6. Instead, the Plaintiffs have raised a fact issue as to whether they did properly object to payment by National directly to B–Right. The Plaintiffs claim National was negligent in making payment of the proceeds meant to cover the loss of Altadis' cargo directly to B–Right, and they point to correspondence between Altadis' agent and NPR's agent that reflects Altadis' concern over payment being made directly to B–Right, which did not own the stolen cigars. *Id.* Again taking these allegations in the light most favorable to the Plaintiffs, this evidence could demonstrate

---

2. NPR also previously pointed out that it was issued a Certificate of Insurance on the subject policy in this case, raising a question as to whether NPR was an "additional in-

sured/loss payee" under the National policy which would entitle it to recover under a third-party beneficiary theory. Dkt. 144. Pp. 5–6.

not only that National knew that Altadis, as owner of the cigars, was the proper recipient of the insurance proceeds, but also that Altadis was objecting to an arrangement that did not involve sending the proceeds directly to Altadis. Under these circumstances, the evidence does not conclusively demonstrate that a waiver of rights occurred. *Id.* at pp. 6–7; Ansell Deposition.

Lastly, the Court finds that National has not shown that its liability should be limited to $500 for one "package" of cigars. The Plaintiffs have presented issues of fact as to whether the shipment in this case consisted of many packages—i.e., 2,505 cartons of cigars—transported overland in a container by B–Right. As such, if liability were to be limited, it would potentially be limited to $500 per carton (package) of cigars, not $500 for the container as a whole. *See, e.g., Groupe Chegaray/V. De Chalus v. P & O Containers*, 251 F.3d 1359, 1363 (11th Cir.2001); Dkt. 143, pp. 7–10. Moreover, the Plaintiffs raise additional issues as to whether the value of the cigars was properly declared over and above the $500 limitation on the bill of lading itself, and as such NPR/B–Right were on clear notice of the cargo's value. Dkt. 141, pg. 7; Dkt. 143, pp. 1–4, 11–15; *Ins. Co. of North America v. Empresa Lineas Maritimas*, 1991 A.M.C. 1057 (M.D.Fla.1990).

The Plaintiffs also correctly point out that judgment has already been entered against B–Right in such an amount as to imply that damages were not limited to $500 for the entire container of cigars. *Id.* at pg. 8. As there remains issues of fact as to what constitutes the proper basis for determining the amount of liability, the Court will not at this point limit the Defendant's liability to $500 in damages on the Plaintiffs' entire cause of action. *See also Belize Trading Co., Ltd. v. Sun Ins. Co. of New York*, 993 F.2d 790 (11th Cir.1993).

National's Motion for Summary Judgment will therefore be denied.

### B. *Key Bank's Motion for Summary Judgment*

Key Bank argues that it is entitled to judgment as a matter of law as to Count XIV of the Second Amended Complaint (intentional interference with business relations) because there is no evidence that Key Bank tortiously interfered with any trust agreement between B–Right and its insurer, National. Key Bank argues that there are no material facts supporting the tortious interference claim because there was no trust agreement between B–Right and National, there is no evidence that Key Bank procured a breach of any agreement, Key Bank was privileged in its actions regarding the line of credit extended to B–Right, and Key Bank did not act with any malice in its actions. Dkt. 120, pg. 3; *Andrews v. Carmody*, 145 Ohio App.3d 27, 761 N.E.2d 1076, 1081 (2001).

According to Key Bank, B–Right initially requested that the insurance settlement check be made out directly to B–Right, as opposed to NPR or Altadis, because NPR owed B–Right money, and B–Right therefore wanted to set off this debt from the insurance proceeds. Dkt. 120, pp. 3–4; Ronald R. Vass Affidavit; Gregory J. Gibson Deposition; Ansell Deposition. Key Bank then argues that B–Right deposited the insurance funds into an account at another bank, where they were commingled with other funds belonging to B–Right and Gibson, B–Right's owner. Dkt. 120, pg. 4. B–Right then allegedly transferred some of these commingled funds to yet another bank, where an account was held individually by Gibson. Gibson Deposition. Key Bank claims that all of this movement of money was for the purpose of hiding funds from Key Bank, because B–Right owed more than $5 million in loans

to Key Bank, a debt which was in default. Dkt. 120, pg. 5; Gibson Deposition.

Key Bank argues that it was entitled and privileged to demand immediate repayment of all of B–Right's defaulted loans, and as such there is no evidence that it improperly interfered with any business relationship between its debtor and a third party. In February 2002, Key Bank alleges that it offered not to demand repayment of the entire loan amount if B–Right would pay Key Bank $250,000 and transfer all of the money out of Gibson's personal account. Einat Gabriely Affidavit; Dkt. 120, pg. 6. It was only at this time that Key Bank claims it became aware of Altadis' claim, which was two months after the check was received by B–Right from National. Gabriely Affidavit. As such, Key Bank argues that it was merely exercising its rights to collect on a substantial debt owed by B–Right, and there is nothing to indicate that it committed any tortious act or had any improper or malicious motive with regard to the money allegedly owed to Altadis. *See also Andrews,* 761 N.E.2d at 1082; *Bailey v. Allgas,* 284 F.3d 1237, 1257 (11th Cir. 2002).[3]

Key Bank initially argues that the Plaintiffs cannot establish a tortious interference with any trust agreement between National and B–Right because there is no clear and convincing evidence as to the existence of any trust agreement between the insurance company and B–Right regarding the insurance proceeds allegedly belonging to Altadis. Dkt. 120, pg. 8; *see also Thomas v. Dye,* 127 N.E.2d 228, 232 (Ohio Ct.App.1954). Key Bank points to sworn statements from Ronald Vass, B–Right's risk manager, and Darrell Mc-Lean, the claims adjuster for National, as expressly denying any knowledge of a trust agreement entered into between National and B–Right. Voss Affidavit; McLean Deposition. Moreover, Key Bank argues that because the insurance settlement check was made out to B–Right alone, and Altadis has failed to respond to a request for admissions concerning the existence of a trust agreement, there is simply *no* conclusive evidence that an enforceable trust agreement ever existed. Dkt. 120, pp. 9–10; Gibson deposition, pp. 75–76. Instead, B–Right purportedly merely owed a debt to Altadis, and Key Bank argues that there was never any restriction placed on the use of the insurance proceeds by National. *Id.* at pg. 12; McLean deposition, pp. 60–66. Key Bank therefore asserts that it cannot now be held liable for seeking payment of its own, significantly larger, debt from B–Right.

In any event, Key Bank also argues that even if an agreement existed, there is no evidence to show that it procured a breach of the agreement. Instead, Key Bank argues that B–Right breached any alleged agreement when it "commingled" the insurance funds with its other accounts in December 2001, two months before the bank even knew about the insurance payment. Dkt. 120, pp. 13–15. Key Bank argues that by the end of 2001, B–Right had already depleted any bank account that would have included a trust fund, and therefore the bank cannot be liable for a breach of that same trust, which no longer existed two months later. *Id.; see also Connecticut General Life Ins. Co. v. Universal Ins. Co.,* 838 F.2d 612, 618–19 (1st Cir.1988). In other words, Key Bank contends that by the time it demanded pay-

---

**3.** Key Bank points out that since B–Right and Key Bank are Ohio companies, and all alleged acts giving rise to a tortious interference claim would have occurred in Ohio, this Court previously determined that Ohio law would apply to any tortious interference claim made by Altadis against Key Bank. *See Altadis USA, Inc. v. NPR, Inc.,* 308 F.Supp.2d 1304, 1307 (M.D.Fla.2004).

ment on its outstanding loans in February 2002, any monies used to pay those loans could not be traced to any alleged trust account, making liability for interference with the trust impossible. *Id.;* Martin Deposition, pp. 59–61.

Key Bank also argues that even if it could be charged with interfering with some sort of agreement between B–Right and National, any such "interference" would be privileged because the bank had a right to protect its own right to payment of a very large debt from B–Right. Dkt. 120, pp. 15–17; *see also Andrews,* 761 N.E.2d at 1080–81; *Pearse v. McDonald's Systems of Ohio, Inc.,* 47 Ohio App.2d 20, 351 N.E.2d 788, 791 (1975); *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 379 N.E.2d 235, 238–39 (1978). Key Bank claims that it simply took proper actions to collect its $5 million lent to B–Right by requiring payment of part of the loan and a transfer of accounts; all actions that were necessary to collect the loans, even if they allegedly violated agreements between B–Right and third parties. Dkt. 120, pp. 16–17; *see also Bill Call Ford, Inc. v. Ford Motor Co.,* 830 F.Supp. 1053, 1062 (N.D.Ohio 1993); *Chandler & Assoc. Inc. v. America's Healthcare Alliance,* 125 Ohio App.3d 572, 709 N.E.2d 190, 197 (1997); *Bennco Liquidating Co. v. Ameritrust Co., N.A.,* 86 Ohio App.3d 646, 621 N.E.2d 760 (1993); *Primus Automotive Financial Svcs., Inc. v. Otto–Wal, Inc.,* 1999 WL 690192 (N.D.Ohio 1999). Key Bank accordingly argues that it was privileged to protect its financial interest in B–Right and therefore cannot be held liable for tortious interference.

Lastly, Key Bank claims that because it was privileged to take action to protect its financial interests, the Plaintiffs must show, by clear and convincing evidence, that the bank's alleged interference occurred with actual malice, a standard Key Bank argues the Plaintiffs cannot meet.

*See, e.g., A & B–Abell Elevator Co. v. Columbus/Central Ohio Building & Construction Trades Council,* 73 Ohio St.3d 1, 651 N.E.2d 1283, 1292 (1995); Dkt. 120, pg. 19. Key Bank argues that there is no evidence that it made any false statements to B–Right because it cannot be disputed that the bank had the right to demand immediate payment of the $5 million in debt from B–Right. Therefore, Key Bank argues that summary judgment should be granted in its favor on Count XIV of the Plaintiffs' Second Amended Complaint.

The Plaintiffs dispute the arguments made by Key Bank, but offer little in the way of evidence that would satisfy their burden of going beyond the pleadings to show, by their own affidavits, or by "depositions, answers to interrogatories, and admissions on file," that there are "specific facts showing there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. The Plaintiffs argue, in fairly conclusory fashion, that National and B–Right maintained a "business relationship" that resulted in an "understanding" that B–Right would turn the insurance proceeds for the lost cigars over to Altadis. The Plaintiffs claim Key Bank was aware of this "constructive trust," and yet nonetheless tortiously interfered with this (admittedly unwritten) agreement by coercing B–Right to place the insurance funds into an account at Key Bank. *See Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Services, Inc.,* 81 Ohio App.3d 591, 611 N.E.2d 955, 960 (1992). The Plaintiffs therefore claim summary judgment should be denied.

The Plaintiffs point out that in Gibson's deposition, he apparently refers to the account containing the insurance proceeds as a "trust account," but in any event, they argue that the Court should find that material facts exist as to whether a constructive trust has been tortiously interfered

with by Key Bank. The fact remains, the Plaintiffs' argument goes, that National and B–Right had an existing business relationship, and Key Bank was well aware that while the insurance check was made out directly to B–Right, the funds were at all times earmarked for payment to Altadis under B–Right's liability policy. Ansell Deposition; Dkt. 140, pg. 4. Nonetheless, on the condition of continuing its line of credit to B–Right, the Plaintiffs re-state their previously-made allegations that Key Bank tortiously used its "superior bargaining position" to interfere with the alleged trust agreement by coercing B–Right to place the insurance funds into an account at the bank. Dkt. 140, pp. 4–5; Andrew Martin Deposition; Gibson Deposition. The Plaintiffs conclusively argue that Key Bank was not privileged to knowingly and maliciously "abscond with monies belonging to others," and therefore material facts remain as to their tortious interference claim against the bank. *See also Elwert v. Pilot Life Ins. Co.,* 77 Ohio App.3d 529, 602 N.E.2d 1219 (1991).

After reviewing the evidence submitted and highlighted by the parties, the Court finds that the Plaintiffs have not met their burden of rebutting Key Bank's Motion and supporting evidence by pointing out specific material facts upon which a reasonable jury could find that a tortious interference occurred. The Court agrees with Key Bank that the Plaintiffs have not presented clear and convincing evidence supporting their allegations in Count XIV that an actual agreement existed with regard to the insurance funds paid by National to B–Right, and there is no theory or facts upon which the Court could find that the bank tortiously interfered with an ongoing "business relationship" or a "constructive trust." Initially, Key Bank points out that in response to its Second Request for Admissions, the Plaintiffs admitted that there was no formal agreement ever entered into between National and B–

Right to hold the insurance funds in trust, instead relying on a claimed "constructive trust" as a basis for their tortious interference claim. Dkt. 145, Exhibit 1. Key Bank asserts that there is no legal basis under Ohio law to establish a claim for "tortious interference with a constructive trust," and in any event, the bank correctly points out that there is a dearth of evidence to establish that Key Bank was ever aware of the existence of a such a constructive trust. Dkt. 145, pp. 7–8; *Concepcion v. Concepcion,* 131 Ohio App.3d 271, 722 N.E.2d 176, 182 (1999); Voss Affidavit; McLean Deposition.

The Court also agrees that the fact that the insurance settlement check was made out to B–Right alone further highlights the lack of evidence to demonstrate that an enforceable trust agreement ever existed. Dkt. 120, pp. 9–10; Gibson deposition, pp. 75–76. Instead, Key Bank amply demonstrates that B–Right simply owed a debt to Altadis, and the Plaintiffs have failed to raise material facts showing that there was any restriction placed on the use of the insurance proceeds by National, let alone any agreement with regard to the eventual destination of the funds. Dkt. 120, pg. 12; McLean deposition, pp. 60–66. Absent sufficient proof of an agreement or arrangement regarding these specific funds that was supposedly interfered with by the bank, the Court holds that Key Bank cannot be held liable for seeking payment of its own $5 million debt from B–Right.

The Court also finds that the bank has shown that the evidence is lacking as to whether it procured a breach of any agreement between National and B–Right, assuming such an agreement existed in the first place. Instead, Key Bank convincingly highlights the timing of the events at issue by showing that it was B–Right that commingled the insurance funds given to it by National by placing those funds in its

accounts in December 2001, which was two months before the bank took any action with regard to B–Right's substantial outlying debt. Dkt. 120, pp. 13–15. The Court cannot fathom why B–Right did not immediately or in due course forfeit the funds directly to their proper recipients long prior to its February 2002 dealings with Key Bank. In any event, Key Bank points out that by the time it sought payment of B–Right's debt, any account that would have allegedly included the insurance funds had already been depleted. *Id.; see also Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 618–19 (1st Cir. 1988); Martin Deposition, pp. 59–61. Under these circumstances, there is nothing to support the Plaintiffs' allegations that any existing trust was tortiously interfered with by the bank.

Furthermore, Key Bank's contentions that it was privileged to allegedly interfere with an agreement between B–Right and a third party, in order to protect its own significant interest in repayment of its loans, are well taken. Dkt. 120, pp. 15–17; *Andrews*, 761 N.E.2d at 1080–81; *Pearse*, 351 N.E.2d at 791; *Juhasz*, 379 N.E.2d at 238–39. Key Bank convincingly argues that it took proper actions to collect its $5 million lent to B–Right by requiring payment of part of the loan and a transfer of B–Right's accounts. The Plaintiffs have not presented any evidence to rebut the argument that these actions were simply a proper attempt to collect the bank's loans, even if it could be argued that Key Bank's actions incidentally interfered with alleged agreements between B–Right and third parties. Dkt. 120, pp. 16–17; *see also Bill Call Ford*, 830 F.Supp. at 1062; *Chandler & Assoc.*, 709 N.E.2d at 197; *Bennco*, 621 N.E.2d at 760; *Primus Automotive*, 1999 WL at 690192.

Even if Key Bank's actions could be considered strong-arm tactics as a result of its "superior bargaining position," as the Plaintiffs' allege, no specific evidence has been presented to the Court to show that the bank did anything but deal aggressively with B–Right in an effort to collect its delinquent loans. Nor is there any evidence to demonstrate that the bank maliciously used tactics that enabled it to "abscond" with money it knew properly belonged to Altadis. *See e.g., A & B–Abell Elevator Co.*, 651 N.E.2d at 1292. The Court therefore holds that Key Bank was privileged to protect its financial interest in B–Right, such that its actions cannot as a matter of law create liability for tortious interference. Key Bank's Motion for Summary Judgment will therefore be granted.

Accordingly, upon due consideration, it is hereby **ORDERED and ADJUDGED**:

1. National's Motion for Summary Judgment Against Plaintiff and NPR, Inc. (Dkt. 105) is **DENIED**.

2. National's Motion to Strike Plaintiffs' Response to Motion for Summary Judgment (Dkt. 147) is **DENIED**. Although National argues that the Plaintiffs' ten-page Response is improper in length because it "incorporates" the arguments made in the Plaintiffs' seventeen-page Response to NPR's Motion for Summary Judgment, the Court notes that the Plaintiffs reiterated the relevant arguments in their Response to National's Motion, and accordingly the Court will not strike the Plaintiffs' Response as being in excess of the page limitation provided in Rule 3.01, Local Rules of the Middle District of Florida.

3. National's Request for Oral Argument (Dkt. 146) is **DENIED**.

4. Defendant Key Bank's Motion for Summary Judgment (Dkt. 120) is **GRANTED**, and judgment will be entered in favor of Key Bank as to Count XIV of the Plaintiffs' Second Amended Complaint.

The Plaintiffs' "Motion to Deny Defendant Key Bank, N.A.'s Motion for Summary Judgment" (Dkt. 140) is **DENIED.**

5. Defendant NPR's Motion for Partial Summary Judgment and Request for Oral Argument (Dkt. 123), and Motion to Strike Plaintiffs' Jury Trial Demand (Dkt. 142) are **DENIED** as moot, as the Plaintiffs have settled their claims against NPR.